**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| VINCENT DANAO | : | |
| | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | NO. 14-6621 |
| ABM JANITORIAL SERVICES | : | |
| AND LOCAL 32BJ SEIU | : | |
| | : | |
| | : | |
| Defendants. | : | |

**<u>MEMORANDUM</u>**

BUCKWALTER, S. J.                                                    May 18, 2015


        Currently pending before the Court are: (1) the Motion to Dismiss of Defendant Local

32BJ, Service Employees International Union ("Union"); and (2) the Motion to Dismiss of

Defendant ABM Janitorial Services – Mid-Atlantic, Inc. ("ABM").  For the following reasons,

the Motions are granted in part and denied in part.

## I.      FACTUAL BACKGROUND

        According to the allegations in the Complaint, Plaintiff Vincent Danao "is of the African

American or Black race, is of the Hebrew Israelite religion, and is disabled by virtue of his

impairments, which include insomnia, back and neck injury and depression, stress/anxiety

conditions."  (Compl. ¶ 6.)  Starting in 1999, Plaintiff was primarily employed by Defendant

ABM Janitorial Services ("ABM") as a Class II Janitor and, at all relevant times, Plaintiff was a

dues-paying member of his Union, Defendant Local 32 BJ SEIU (the "Union"), in good standing.

(<u>Id.</u> ¶¶ 8–9.)  During his employment with ABM, Plaintiff received several accolades for good

performance, several pay raises, and a promotion to ABM supervisor.  (<u>Id.</u> ¶¶ 11–12.)  Plaintiff

also served as a shop steward for the Union during part of his employment for ABM.  (<u>Id.</u> ¶ 13.)

In 2007, Plaintiff converted to the Hebrew Israelite religion, which made Saturday his Sabbath day.  (<u>Id.</u> ¶ 14.)  As a result, Plaintiff requested that ABM provide him a religious accommodation to allow him to observe the Sabbath from approximately 9:00 a.m. to 3:30 p.m. on Saturdays.  (<u>Id.</u> ¶ 15.)  He told ABM that he would be willing to work later in the day on Saturdays.  (<u>Id.</u>)  ABM did not immediately grant Plaintiff's request for religious accommodation.  (<u>Id.</u> ¶ 16.)  Shortly thereafter, Plaintiff began to experience harassment from his manager and supervisor, including hostility, a change in demeanor, and extra workload in comparison with similarly-situated employees who were not of the Hebrew Israelite Faith.  (<u>Id.</u> ¶ 17.)  In addition, Plaintiff's supervisor began to falsely criticize his performance and scrutinize his whereabouts in a manner different from how he treated similarly-situated employees not of Plaintiff's faith, including conducting constant surveillance on Plaintiff via ABM's close circuit television.  (<u>Id.</u>)

As a result of ABM's treatment of Plaintiff, he filed charges against his employer with the Equal Employment Opportunity Commission ("EEOC") in 2007 and 2009, alleging discrimination based on his religion and retaliation for complaining of discrimination.  (<u>Id.</u> ¶ 18.)  Despite these charges, ABM continued to harass him and discriminate against him both based on his religion and in retaliation for filing EEOC charges.  (<u>Id.</u> ¶ 19.)  As part of Plaintiff's allegations, his supervisor was required to attend an anger management class.  (<u>Id.</u> ¶ 20.)

In 2009, ABM fired Plaintiff based on falsely-alleged poor performance.  (<u>Id.</u> ¶ 21.)  As a result of Plaintiff's complaint to the Pennsylvania Human Resources Commission ("PHRC"), however, he was rehired with seniority and ABM was put on notice that ABM was not to

discriminate against Plaintiff or retaliate against him in the future.  (Id.)  Plaintiff agreed to return

to work without back pay.  (Id.)  Upon rehire, Plaintiff agreed to drop his charges/claims through

the PHRC and ABM offered to pay Plaintiff ten dollars, which it allegedly never did.  (Id.)

Between 2007 and 2013, Plaintiff filed four complaints of unfair labor practices against

the Union.  (Id. ¶ 22.)  These complaints alleged that the Union failed to properly represent him

regarding ABM's treatment of him.  (Id.)

In 2012, Plaintiff alleges that he faced more discriminatory and retaliatory treatment by

ABM through his new supervisor (Terrance) and manager (Ms. Velez).  (Id. ¶ 23.)  This

treatment included assigning Plaintiff an excessive workload in comparison with his peers,

refusing to provide him with a definitive work description, leaving him in confusion as to what

his duties and work areas were for around seven months, screaming and hollering at him,

monitoring him while he was in the men's room, repeatedly threatening to suspend him based on

false allegations of poor performance, and repeatedly writing him up for falsely alleged poor

performance.  (Id.)  As a result, Plaintiff began to develop stress, anxiety, insomnia, and

depression symptoms for which he sought medical treatment.  (Id. ¶ 24.)  Plaintiff then requested

a disability accommodation in the form of a transfer to a new work location, which ABM denied.

(Id. ¶ 25.)

On October 16, 2012, Plaintiff injured his neck and back at work while performing his

duties.  (Id. ¶ 26.)  He filed a Workmen's Compensation claim and was advised to take off of

work for approximately thirty days to recuperate.  (Id.)  Plaintiff also needed time off as a result

of stress, anxiety, and depression.  (Id.)  ABM denied that it was responsible for Plaintiff's

injuries, but agreed to settle the matter with Plaintiff by paying him $2,500 in the form of wages,

and allowing him thirty days of time off.  (Id. ¶ 27.)  Plaintiff was out of work from October 16, 2012 to November 16, 2012, during which time he received treatment for both his neck and back injury, and for his stress, anxiety, and depression.  (Id. ¶ 28.)

After November 16, 2012, Plaintiff required continued treatment for his conditions.  (Id. ¶ 29.)  Nonetheless, Plaintiff's second level manager, Ms. Velez, repeatedly assigned him more work than similarly-situated employees outside of one or more of Plaintiff's protected classes of religion, race, disability, and those who had not complained of discrimination.  As a result of Plaintiff's back injury, he was given a medically-prescribed lifting restriction.  (Id. ¶ 32.)

Plaintiff filed several grievances against ABM through the Union.  (Id. ¶ 33.)  When Plaintiff complained about the level and quality of the Union's representation of him, however, Union representatives told him the Union did not care if he was dissatisfied or if he complained to the National Labor Relations Board ("NLRB").  (Id. ¶ 33.)  Plaintiff alleges that the Union has a pattern and practice of representing Caucasian Union members better than African-American Union members.  (Id. ¶ 34.)

After Plaintiff returned to work in November 2012, ABM purportedly resumed its harassment of him.  (Id. ¶ 35.)  For example, although Plaintiff routinely started preparation for work four to ten minutes early each day, ABM did not give Plaintiff overtime pay for that accumulation of work.  (Id. ¶ 36.)  Plaintiff also routinely worked past the end of his shift to complete work, which his superiors requested, and had to file an eventual grievance through the Union, the result of which was a payment of four hours overtime in June 2012.  (Id. ¶ 37.)  Sometime in November 2012, Ms. Velez suspended Plaintiff for three days on the allegation of poor performance on October 16, 2012.  (Id. ¶ 38.)  Specifically, Velez claimed Plaintiff had left

work undone on that date.  (Id.)  Plaintiff asserts that this report was a fabrication in retaliation

for his Workmen's Compensation claim, especially because there had been no criticism of the

work on October 16, 2012.  (Id.)  Thereafter, on February 20, 2013, during his work break and

purportedly as a result of his insomnia, Plaintiff accidentally fell asleep and was awakened by his

immediate supervisor who took a photograph of him.  (Id. ¶ 42.)

Following the February 20, 2013 incident, ABM suspended Plaintiff for three days, and

then fired him on February 27, 2013.  (Id. ¶ 43.)  Plaintiff asserts that this had been his first

instance of falling asleep at work and, according to ABM's written policy, a first time offense is

only to be disciplined by a warning and a three-day suspension.  (Id. ¶ 44.)  The Union refused to

push the issue with ABM despite the fact that both ABM and the Union knew that Plaintiff fell

asleep because of his disability.  (Id. ¶¶ 45–46.)  In addition, ABM challenged Plaintiff's receipt

of unemployment compensation—as it had previously done in 2010—and the Unemployment

Compensation Referee ruled that he was eligible for compensation.  (Id. ¶ 46.)

Plaintiff filed two cases against the Defendants.  His first—filed in state court but

subsequently removed to federal court—set forth the same operative facts, but asserted two

causes of action: (1) a breach of duty of fair representation claim against the Union due to the

Union's failure to make a particular argument when presenting the contractual grievance

challenging his discharge; and (2) a breach of contract claim against both the Union and ABM,

claiming that ABM violated the terms of the Collective Bargaining Agreement by terminating

Plaintiff for a first incident of sleeping on the job, and that the Union violated the agreement by

breaching its duty of fair representation.  (Compl., Denao v. 32BJ, SEIU and Mid Atlantic Inc.

(ABM Janitorial Services), No. Civ.A.13-7266 ("Danao I").)[1]  This Court dismissed the entire

action against both Defendants, and Plaintiff appealed only the dismissal as it pertained to the

Union.  Denao v. Service Employees Int'l Union, Local 32BJ, No. 14-3233.

Plaintiff filed the current suit in federal court on November 13, 2014 ("Danao II").  This

suit sets forth eight causes of action as follows: (1) religious discrimination in violation of Title

VII against Defendant ABM; (2) disability discrimination in violation of the Americans With

Disabilities Act ("ADA") and Americans With Disabilities Act As Amended ("ADAA") as to

Defendant ABM; (3) retaliation as to Defendant ABM in violation of Title VII, the ADAA, and

the ADA; (4) racial discrimination in violation of 42 U.S.C. § 1981 as to Defendant ABM; (5)

violation of the Pennsylvania Human Relations Act ("PHRA") as to Defendant ABM; (6)

violation of the public policy of Pennsylvania for termination of employment in retaliation for

filing a worker's compensation claim as to Defendant ABM; (7) violation of Title VII for racial

discrimination as to Defendant the Union; and (8) violation of 42 U.S.C. § 1981 for racial

discrimination as to Defendant, the Union.  On February 11, 2015, Defendant ABM filed a

Motion to Strike and Motion to Dismiss, and Defendant the Union filed a Motion to Dismiss.

Plaintiff responded on March 26, 2015 and March 18, 2015 respectively, and Defendants filed

Reply Briefs on March 31, 2015 and April 1, 2015 respectively.  The Motions are now ripe for

judicial review.

## II.    STANDARD OF REVIEW

Under Rule 12(b)(6), a defendant bears the burden of demonstrating that the plaintiff has

---

[1]  In the first lawsuit, Plaintiff spelled his last name as "Denao," and the case was captioned as such.  In this suit, Plaintiff has spelled his name "Danao," which is the spelling Defendants have in their records.

not stated a claim upon which relief can be granted.  Fed. R. Civ. P.12(b)(6); see also Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005).  In Bell Atlantic Corporation v. Twombly, 550 U.S. 544 (2007), the United States Supreme Court recognized that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Id. at 555. Following these basic dictates, the Supreme Court, in Ashcroft v. Iqbal, 556 U.S. 662 (2009), subsequently defined a two-pronged approach to a court's review of a motion to dismiss.  "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id. at 678.  Thus, although "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."  Id. at 678–79.

    Second, the Supreme Court emphasized that "only a complaint that states a plausible claim for relief survives a motion to dismiss."  Id. at 679.  "Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Id. A complaint does not show an entitlement to relief when the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct.  Id.; see also Phillips v. Cnty. of Allegheny, 515 F.3d 224, 232–34 (3d Cir. 2008) (holding that: (1) factual allegations of complaint must provide notice to defendant; (2) complaint must allege facts suggestive of the proscribed conduct; and (3) the complaint's "'factual allegations must be enough to raise a right

to relief above the speculative level.'" (quoting <u>Twombly</u>, 550 U.S. at 555)).

Notwithstanding these new dictates, the basic tenets of the Rule 12(b)(6) standard of review have remained static.  <u>Spence v. Brownsville Area Sch. Dist.</u>, No. Civ.A.08-626, 2008 WL 2779079, at *2 (W.D. Pa. July 15, 2008).  The general rules of pleading still require only a short and plain statement of the claim showing that the pleader is entitled to relief and need not contain detailed factual allegations.  <u>Phillips</u>, 515 F.3d at 233.  Further, the court must "accept all factual allegations in the complaint as true and view them in the light most favorable to the plaintiff." <u>Buck v. Hampton Twp. Sch. Dist.</u>, 452 F.3d 256, 260 (3d Cir. 2006).  Finally, the court must "determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." <u>Pinkerton v. Roche Holdings Ltd.</u>, 292 F.3d 361, 374 n.7 (3d Cir. 2002).

## III.   DISCUSSION

### A.   <u>The Union's Motion to Dismiss</u>

As set forth above, Plaintiff brings two causes of action against the Union: Count Seven alleging a violation of Title VII for racial discrimination, and Count Eight alleging a violation of 42 U.S.C. § 1981 for racial discrimination.  The Union now seeks dismissal of both counts on several grounds, as follows: (1) Plaintiff failed to exhaust his administrative remedies as to his Title VII claim by filing a timely charge with the EEOC; (2) Plaintiff fails to allege sufficient facts to state a claim under Title VII; (3) Plaintiff fails to allege sufficient facts to state a claim against the Union for race discrimination under 42 U.S.C. § 1981; and (4) Plaintiff's claim under 42 U.S.C. § 1981 amounts to impermissible claim splitting and should be dismissed.  The Court addresses each argument separately.

1.     **Whether Plaintiff Failed to Exhaust Administrative Remedies on His Title VII Claim**

Defendant's first argument contends that Plaintiff has not exhausted administrative remedies.   It is well-established that a Title VII plaintiff is required to exhaust all administrative remedies before bringing a claim for judicial relief.  42 U.S.C. § 2000e-5(e); Antol v. Perry, 82 F.3d 1291, 1295 (3d Cir. 1996); DeLa Cruz v. Piccari Press, 521 F. Supp. 2d 424, 431 (E.D. Pa. 2007).  To do so, the plaintiff must "fil[e] a timely discrimination charge with the EEOC." DeLa Cruz, 521 F. Supp. 2d at 431 (citing Waiters v. Parsons, 729 F.2d 233, 237 (3d Cir. 1984)).  The purpose of this requirement is "(1) to ensure 'that an employer is made aware of the complaint lodged against him and is given the opportunity to take remedial action,' and (2) to give 'the EEOC the opportunity to fulfill its statutory duties of eliminating unlawful practices through the administrative process.'" O'Donnell v. Michael's Family Rest., Inc., No. Civ.A.07-5386, 2008 WL 2655565, at *2 (E.D. Pa. July 1, 2008) (quoting Jackson v. J. Legis Crozer Library, No. Civ.A.07-481, 2007 WL 2407102, at *5 (E.D. Pa. Aug. 22, 2007)).[2]  In Title VII actions, failure to exhaust administrative remedies is an affirmative defense on which the defendant bears the burden of proof.  Williams v. Runyon, 130 F.3d 568, 573 (3d Cir. 1997).  Nonetheless, as a general rule, the exhaustion requirement is "strictly construed and the failure to pursue the appropriate administrative remedies will bar judicial review." Elberson v. Pa., 396 F. App'x

---

[2]  "Although the PHRA does not contain an analogous [exhaustion of administrative remedies] requirement, courts have held that the PHRA should be interpreted consistently with Title VII." McLaughlin v. Rose Tree Media Sch. Dist., 52 F. Supp. 2d 484, 491–92 (E.D. Pa. 1999) (citations omitted).  "To bring suit under the PHRA, a plaintiff must first have filed an administrative complaint with the PHRC within 180 days of the alleged act of discrimination." Woodson v. Scott Paper Co., 109 F.3d 913, 925 (3d Cir. 1997) (citing 43 Pa. Cons. Stat. §§ 959(a), 962).

821–22 (3d Cir. 2010).

Title VII provides:

A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred . . . except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred, or within thirty days after receiving notice that the State or local agency has terminated the proceedings under the State or local law, whichever is earlier, and a copy of such charge shall be filed by the Commission with the State or local agency.

42 U.S.C. § 2000e-5(1). As clarified by the United States Court of Appeals for the Third Circuit, "[u]nder Title VII, a charge of race discrimination in employment must be filed with the EEOC within 180 days of the occurrence of the alleged unlawful employment practice." Burgh v. Borough Council of Borough of Montrose, 251 F.3d 465, 469–70 (3d Cir. 2001) (citing 42 U.S.C. § 2000e-5(e)(1)). "If the complainant also initiates a complaint with a parallel state agency . . . the period for filing the charge with the EEOC is extended to 300 days from the day of the alleged unlawful employment practice." Id. at 470. "Generally a judicial complaint . . . will be dismissed for failure to exhaust administrative remedies if a supporting EEOC charge was not filed within 180 or 300 days (depending on state law) of notification to the employee of the adverse employment action." Ruehl v. Viacom, Inc., 500 F.3d 387, 382 (3d Cir. 2007).

In the present case, Plaintiff dual-filed his Charge of Discrimination with the EEOC and the PHRC asserting, in part, that, "[o]n or about April 15, 2013, the Union held that ABM was justified in terminating my employment for sleeping on the job." (Aff. of Lyle Brown ("Brown Aff."), Ex. B, 2014 EEOC Charge of Discrimination.) Having instituted proceedings with the

state agency, Plaintiff was thus required to file his charge of discrimination with the EEOC within 300 days of the April 15, 2013 date—or by approximately February 15, 2014.  He did not do so, however, until April 1, 2014—a month and a half late.  Under a strict construction of the statute of limitations, Plaintiff's administrative charge was untimely, thereby requiring that this lawsuit be dismissed for failure to exhaust administrative remedies.

As noted by Plaintiff, however, this simplistic analysis fails to account for the Supreme Court's dictates in Edelman v. Lynchburg College, 535 U.S. 106 (2002),[3] which upheld an EEOC regulation dictating that an EEOC charge is timely filed at the point that the EEOC receives sufficient information from the charging party to indicate that he is complaining of discrimination.  In that case, the issue before the court was the validity of EEOC regulation 29 C.F.R. § 1601.12, which permits an otherwise timely filer to verify a charge after the time for filing has expired.  Id. at 109.  On June 6, 1997, respondent Lynchburg College denied academic tenure to petitioner Leonard Edelman, who faxed a letter to an EEOC field office on November 14, 1997, claiming "gender-based employment discrimination, exacerbated by discrimination on the basis of . . . national origin and religion."  Id.  He made no oath or affirmation of the facts. Id.  On November 26, 1997, Edelman's lawyer wrote to the field office requesting an interview with an EEOC investigator and stating his "understanding that delay occasioned by the interview will not compromise the filing date, which will remain as November 14, 1997."  Id.  An EEOC employee replied to Edelman and advised him to arrange an interview with a member of the field office and reminded Edelman that "a charge of discrimination must be filed within the time limits imposed by law."  Id.  After the interview, the EEOC sent Edelman a Form 5 Charge of

---

[3]  Plaintiff mistakenly gives the citation of this case as 511 U.S. 106 (2002).

Discrimination for him to review and verify by oath or affirmation.  Id. at 109–110.  On April 15, 1998, 313 days after the June 6, 1997 denial of tenure, the EEOC received the verified Form 5, which it forwarded to the College for response.  Id. at 110.  After completing an investigation, the EEOC issued Edelman a notice of right to sue.  Id.  Edelman brought suit in Virginia state court and the College removed the case to federal court.  Id.  Thereafter, the College moved to dismiss, claiming that Edelman failed to file the verified EEOC charge within the applicable filing period.  Id.  Edelman responded that his November 1997 letter was a timely-filed charge, and that under an EEOC regulation, 29 CFR § 1601.12(b) (1997),[4] the verification on the Form 5 related back to the letter.  Id.  The District Court held, however, that the November letter was not a "charge" within the meaning of Title VII because neither Edelman nor the EEOC treated it as one, with the consequence that there was no timely filing to which the verification on Form 5 could relate back.  Id.  After finding no ground for equitable tolling of the filing requirements, the District Court dismissed the Title VII complaint and remanded the state law claims.  Id.  The Court of Appeals affirmed.  Id. at 110–11.

The United States Supreme Court, however, reversed.  It noted that "[a] complaint to the EEOC starts the agency down the road to investigation, conciliation, and enforcement, and it is no small thing to be called upon to respond . . . [i]n requiring the oath or affirmation . . .

---

[4]  The regulation provides in relevant part that "a charge is sufficient when the Commission receives from the person making the charge a written statement sufficiently precise to identify the parties, and to describe generally the action or practices complained of.  A charge may be amended to cure technical defects or omissions, including failure to verify the charge, or to clarify and amplify allegations made therein.  Such amendments and amendments alleging additional acts which constitute unlawful employment practices related to or growing out of the subject matter of the original charge will relate back to the date the charge was first received." 29 U.S.C. § 1601.12(b).

Congress presumably did not mean to affect the nature of Title VII as 'a remedial scheme in which laypersons, rather than lawyers, are expected to initiate the process.'"  Id. at 115 (quotations omitted).  It went on to reason that "[c]onstruing § 706 to permit the relation back of an oath omitted from an original filing ensures that the lay complainant, who may not know enough to verify on filing, will not risk forfeiting his rights inadvertently.  At the same time, the EEOC looks out for the employer's interest by refusing to call for any response to an otherwise sufficient complaint until the verification has been supplied."  Id.  Accordingly, the Supreme Court held that the EEOC's regulation permitting an otherwise timely filer to verify a discrimination charge after the time for filing has expired was a valid interpretation of the statute governing the filing of charges of discrimination with the EEOC.  Id. at 118–19.

In the present case, Plaintiff visited the Philadelphia District Office of the EEOC on February 5, 2014 and completed the EEOC's Intake Questionnaire, which contains the required information to make out his charge of racial discrimination.  (Pl.'s Resp. Opp'n Mot. Dismiss, Exs. B & C.)  Thereafter, on April 1, 2014, with the assistance of his attorney, Plaintiff returned to the EEOC office and perfected his EEOC charge against the Union under the same number documented on his previous intake paperwork.  (Id., Exs. A & B.)  An EEOC supervisor purportedly informed Plaintiff and his counsel that he would receive credit going back to February 5, 2014, as the date of the initial filing of that charge.  (Id.)

Taking these facts as true, the Court finds that Plaintiff has plausibly pled exhaustion of administrative remedies within the requisite time limits.  Accordingly, the Court declines to dismiss the Title VII claim on this ground.

2.      **Whether the Title VII Claim Against the Union Fails to State a Claim Upon Which Relief May Be Granted**

The Union next argues that Plaintiff fails to allege sufficient facts in order to state a Title VII claim of discrimination against the Union.  Upon consideration of the parties' briefs, the Court must agree.

Under Title VII, unions are prohibited from discriminating on the basis of a protected status for the same reasons as employers.  McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 285 (1976); Watson v. Dept. of Servs. for Children, Youths and Their Families Delaware, 932 F. Supp. 2d 615, 622 (D. Del. 2013)  To establish a prima facie case in this context, a plaintiff must show (1) a violation of the collective bargaining agreement with respect to the plaintiff; (2) the union permitted the violation to go unaddressed, thereby breaching its duty of fair representation; and (3) some indication that the union's actions were motivated by some discriminatory animus.  Lopresti v. Cnty of Lehigh, No. Civ.A.12-6281, 2014 WL 1885278, at *6 (E.D. Pa. May 12, 2014) (citing Young v. Local 1201, Firemen & Oilers Union, No. Civ.A.07–3576, 2009 WL 3152119, at *4 (E.D. Pa. Sept. 25, 2009), aff'd, 419 F. App'x 235 (3d Cir. 2011)).  "The deliberate choice not to process grievances" can, under certain circumstances, violate Title VII.  Goodman v. Lukens Steel Co., 777 F.2d 113, 127 (3d Cir. 1985).  To show a breach of the duty of fair representation for purposes of the first element, however, an employee must show more than that the union refused to represent the employee, "even if the [employee's] claim was meritorious."  Findley v. Jones Motor Freight, 639 F.2d 953, 958 (3d Cir. 1981).  Rather, "[p]roof of arbitrary or bad faith union conduct in deciding not to proceed with the grievance is necessary to establish lack of . . . fair representation."  Id.  "To demonstrate bad

faith, the plaintiff must show that the union had hostility toward plaintiff or the plaintiff's class

and that the hostility negatively affected the union's representation of the plaintiff."  Boyer v.

Johnson Matthey, Inc., No. Civ.A.02-8382, 2005 WL 35893, at *9 (E.D. Pa. Jan. 6, 2005) (citing

Bell v. Glass, Molders, Pottery, Plastics & Allied Workers Int'l Union, No. Civ.A.00–1693, 2002

WL 3210721, at *4 (W.D. Pa. Aug. 29, 2002).  This requires that a plaintiff present sufficient

evidence to allow a fact finder to conclude that the union is "treating some people less favorably

than others based upon a trait that is protected under Title VII."  Iadimarco v. Runyon, 190 F.3d

151, 161 (3d Cir. 1999).

Plaintiff's factual allegations against the Union are as follows:

33.   Plaintiff filed several grievances against ABM through the Union, however, when Plaintiff sought to discuss the level and quality of the Union's representation with him, including assigning his grievances to lower level shop stewards rather than more experienced stewards, or to legal counsel, not addressing his allegations of discrimination, and it bluntly telling him that the Union did not care if he was dissatisfied with its representation, and that it did not care if he complained against it to the Department of Labor, Plaintiff filed several complaints against it, to the National Labor Relations Board (NLRB).  The Union discriminatorily treated Plaintiff by providing him with inferior representation, in comparison with similarly situated Caucasion employees.

34.   The Union had/has a practice and pattern of taking actions to preserve and protect the employment of Caucasian members, in comparison with African American members, including developing posters to preserve such employment, by putting public pressure on ABM; conversely, the Union, has a practice and pattern of remaining relatively idle, while African American employees are being suspended and fired based on falsely alleged poor performance, or performance for which Caucasian union members were/are not fired or disciplined for.

. . .

43.   The Union refused to push the issue with ABM, that it could not fire Plaintiff for the incident on February 20, 2013 [when he fell asleep at work], and did not emphasize the mitigating factors that it knew that Plaintiff fell asleep as a result of his disability, and that there was no intent to sleep on

duty—ABM's policy is interpreted to punish intentional conduct, and is not interpreted to punish someone who is ill.

. . .

49.     The Union has a practice and pattern of intentionally providing better, more zealous and more vigorous representation of its Caucasian members in the context of defending and grieving against disciplinary actions including termination, and using its political influence to preserve their employment, than it does for African American employees.

73.     Defendant, the Union, intentionally treated Plaintiff in a discriminatory manner based on his race, in comparisons [sic] with similarly situated Caucasian union members, with respect to their representation of such union members, who were facing disciplinary action from Defendant ABM, including, but not limited to, intentionally providing a lower level of representation during the grievance process, not requiring or insisting that ABM follow its own documented policies and procedures, when rendering discipline and, not using informal methods to salvage union member's [sic] employment, including using publicity and protest.

74.     Defendant, the Union has a pattern and practice of providing inferior representation for its African American – Black members, in comparison with that for its similarly situated Caucasian members.

(Compl. ¶¶ 33, 34, 43, 49, 73, 74.)

The Union now contends that these allegations fail to establish that the Union breached its duty of fair representation, that the Union's actions were motivated by racial animus, or that the Union's conduct undermined the arbitral or grievance process.[5]   The Court considers each individually.

### a.     __Breach of Duty of Fair Representation__

A union may breach its duty of fair representation if its actions are "arbitrary,

---

[5]   In this last argument, the Union asserts that Plaintiff has failed to plead any facts which demonstrate that the Union's "arbitrary, discriminatory, and bad faith" conduct was the cause of his harm or that, had the Union engaged in better representation, than his discharge would have been remedied.  As the Court finds that Plaintiff's Title VII claim against the Union fails on other grounds, this issue need not be addressed.

discriminatory, or in bad faith." Air Line Pilots Ass'n, Int'l v. O'Neill, 499 U.S. 65, 67 (1991)

(quoting Vaca v. Sipes, 386 U.S. 171, 190 (1967)).  "[A] union's actions are arbitrary only if, in

light of the factual and legal landscape at the time of the union's actions, the union's behavior is

so far outside a 'wide range of reasonableness' as to be irrational."  Id. (citation omitted).  When

considering whether a union's actions fall within that range, courts "must be highly deferential,

recognizing the wide latitude that negotiators need for the effective performance of their

bargaining responsibilities."  Id. at 78.  That standard "gives the union room to make

discretionary decisions and choices, even if those judgments are ultimately wrong," and even if

its errors in judgment may rise to the level of negligence.  Marquez v. Screen Actors Guild, Inc.,

525 U.S. 33, 45–46 (1998); see also United Steelworkers of Am. v. Rawson, 495 U.S. 362,

372–73 (1990) ( "[M]ere negligence, even in the enforcement of a collective-bargaining

agreement, would not state a claim for breach of the duty of fair representation.").  Furthermore,

when reviewing representation at a grievance hearing, courts must give "due regard for the fact

that both the advocates and the tribunal members are laymen," not lawyers.  Findley v. Jones

Motor Freight, Div. Allegheny Cnty., 639 F.2d 953, 961 (3d Cir. 1981); see also Deans v.

Kennedy House, Inc., 998 F. Supp. 2d 393, 419 (E.D. Pa. 2014).  Thus, even if a plaintiff's

allegations that the Union attorney failed to develop certain arguments are well-founded, they

constitute mere disagreements over tactics and strategy, not a breach of the duty of fair

representation.  DeFillippes v. Star Ledger, 872 F. Supp. 138, 141 (D.N.J. 1994).

In the present case, Plaintiff's allegations of the Union's purported breach of the duty of

fair representation boil down to the following assertions:

- The Union assigned his grievances to lower level shop stewards rather than

17

more experienced stewards, or to legal counsel;

- The Union did not address  his allegations of discrimination;

- The Union told him that it did not care if he was dissatisfied with its representation, and that it did not care if he complained against it to the Department of Labor;

- The Union refused to push the issue with ABM, that it could not fire Plaintiff for falling asleep at work on February 20, 2013;

- The Union did not emphasize the mitigating factors that it knew that Plaintiff fell asleep as a result of his disability, and that there was no intent to sleep on duty.

Such conclusory allegations do not show that the Union's actions were arbitrary, discriminatory, or in bad faith.  As noted above, unions are given a wide range of reasonableness.  Nothing in Plaintiff's unspecific assertions shows that the Union's actions were without rational basis or explanation such that they fell outside that range.

In an effort to inject some substance into his Complaint, Plaintiff contends that the Union was aware that Plaintiff suffered from insomnia, which caused him to fall asleep, and that the Union did not argue that Plaintiff should have only been given a warning and a three-day suspension.  Such arguments, however, are nothing more than complaints about the Union's strategy or assertions that it was negligent in its presentation of Plaintiff's grievance.  As noted by the Third Circuit, "[w]hile the application of the 'perfunctory' standard has proven difficult over time, we have recently made clear that whatever it may mean in other circumstances, '(m)ere ineptitude or negligence in the presentation of a grievance by a union has almost uniformly been rejected as the type of conduct intended to be included within the term 'perfunctory.'"  Riley v. Letter Carriers Local No. 380, 68 F.2d 224, 228 (3d Cir. 1981) (quoting

18

Findley, 639 F.2d at 960 & n.2).  "What is required is a showing of actual bad faith or arbitrary conduct.  The fact that trained counsel would have avoided the error or pursued a different strategy is not enough."  Riley, 668 F.2d at 228.  Given that Plaintiff has offered nothing more than perfunctory complaints about the Union's strategy, this cause of action fails to state a plausible claim for relief and, thus, must be dismissed pursuant to Rule 12(b)(6).

### b.   **Racial Motivation**

The Union also contends that the Complaint fails to put forth any well-pled factual allegation demonstrating that the Union was motivated by racial animus.  As noted above, Plaintiff broadly alleges that the Union discriminatorily treated Plaintiff by providing him with inferior representation, in comparison with similarly-situated Caucasian Union members, had a pattern and practice of providing more aggressive representation to protect the rights of Caucasian Union members than those of African-Americans Union members, and intentionally treated Plaintiff in a discriminatory manner based on race in comparison with similarly-situated Caucasian Union members.  (Compl. ¶¶ 33, 34, 49, 73, 74.)  Plaintiff contends that such allegations allow the rational inference that Plaintiff "was able to observe the differential treatment that he has pled, through his first hand encounters with union officials, as well as his receipt of information about the efforts that the union was using to salvage similarly situated Caucasians' employment, which it was not utilizing on his behalf."  (Pl.'s Resp. Opp'n Union Mot. Dismiss 13.)  Further, Plaintiff asserts that he has pled an "extremely specific example of discrimination" by alleging that the Union has a pattern and practice of using less experienced stewards for grievances by African Americans, while using its best and most experienced stewards for Caucasians.  (Id.)  Finally, Plaintiff argues that the allegations of his Complaint

19

allow an inference that the Union's failure to raise certain arguments to save his job was as a result of his race.  (Id. at 15.)

Quite contrary to Plaintiff's vigorous arguments in response to the Motion to Dismiss, however, the Complaint consists of nothing more than threadbare recitals of the elements of racial discrimination supported by mere conclusory statements.  To be "similarly situated" for the purposes of a workplace discrimination or retaliation case, "comparator employees 'must be similarly situated in all relevant respects.'"  Philpot v. Amtrak, No. Civ.A.10-1276, 2011 WL 5339030, at *5 (E.D. Pa. Nov. 3, 2011) (citing Wilcher v. Postmaster Gen., 441 F. App'x 879, 882 (3d Cir. 2011)) (further citations omitted).  As the Third Circuit has explained, "[a] determination of whether employees are similarly situated takes into account factors such as the employee's job responsibilities, the supervisors and decision-makers, and the nature of the misconduct engaged in."  Wilcher, 441 F. App'x at 882.  If two employees "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish . . . the employer's treatment of them," they will be deemed "similarly situated."  McCullers v. Napolitano, 427 F. App'x 190, 195 (3d Cir. 2011) (quotation omitted).  By the same token, if their conduct differed in a way that would be material to an employer, they will not be considered proper comparators.  See id.

Plaintiff, in this case, cites to no facts whatsoever—such as remarks, comments, complaints, writings—from which racial discrimination may be inferred.  Moreover, to the extent the Complaint alleges that Caucasian union members were treated differently, Plaintiff does not state that this information is based on his own observations.  Nor does Plaintiff put forth any factual details suggesting how similarly-situated Caucasian members were treated better by the

Union.  The Complaint contains no allegations that union members with similar concerns and

similar disciplinary histories were given more superior representation by the Union,

notwithstanding Plaintiff's current representation that he observed such situations.  Indeed, the

Complaint is devoid of any factual details.[6]  Absent at least some modicum of specificity, this

cause of action cannot survive.[7]

> **3.    Whether the 42 U.S.C. § 1981 Claim Against the Union Fails to State a Claim Upon Which Relief May Be Granted**

A claim under § 1981 generally requires the same elements of proof as an employment

discrimination claim under Title VII, but "is limited to issues of racial discrimination in the

making and enforcing of contracts."  Anjelino v. N.Y. Times Co., 200 F.3d 73, 98 (3d Cir. 1999);

see also Brown v. Philip Morris Inc., 250 F.3d 789, 797 (3d Cir. 2001) (requiring § 1981

claimants to establish "intent to discriminate on the basis of race").  A union may be liable under

§ 1981 if it instigated or actively supported an employer's discriminatory actions or if it

otherwise discriminated against one of its members.  Deans v. Kennedy House, Inc., 998 F. Supp.

2d 393, 14 (E.D. Pa. 2014).  "A union's failure 'to challenge discriminatory discharges' or its

'refusal to assert racial discrimination as a ground for grievances' can constitute such unlawful

---

[6]  Plaintiff argues that he specifically named two Caucasian similarly situated personnel in his EEOC charge.  These individuals, however, were not identified in the Complaint and, as such, are not part of his well-pled allegations.

[7]  Plaintiff cites to the case of Trader v. Fiat Distributers, Inc., 476 F. Supp. 1194 (D. Del. 1979) for the proposition that dates and details are not required to state a cognizable claim for relief under Title VII and § 1981.  This case, however, is not at all persuasive.  Primarily, it was decided prior to the issuance of the more stringent Twombly/Iqbal standards for pleading, and, as such, the complaint in that case was not subject to the more rigorous Rule 12(b)(6) review.  Moreover, even under the more lenient standard, the court in Trader found that the plaintiff's "general conclusory allegations concerning [the defendant's] suspension, layoff, and discharge policies . . . are too vague to support a cause of action under the Civil Rights Acts."  Id. at 1199.

discrimination."  Id. (quotations omitted).

      As noted above, "[s]imply stating that one endured race discrimination without presenting

allegations suggestive of such conduct does not meet [Third Circuit] pleading standards."

Funayama v. Nichia Am. Corp., No. Civ.A.08–5599, 2009 WL 1437656 at *5 (E.D. Pa. May 21,

2009).  Repeatedly, courts have dismissed claims under § 1981 where the plaintiffs offered only

generalized legal conclusions regarding the unions' alleged racial animus.  See, e.g., Deserne v.

Madlyn and Leonard Abramson Ctr. For Jewish Life, Inc., No. Civ.A.10-3699, 2011 WL

605699, at *2 (E.D. Pa. Feb. 16, 2011) (holding that allegations that plaintiff and other

unidentified black Haitian colleagues were denied performance evaluations and salary increases

while unidentified Caucasian colleagues received performance evaluations and salary increases

was insufficient to plead a § 1981 claim where plaintiff did not identify the race of the

individuals who determined whether or not to grant performance evaluations or salary increases);

Kiniropoulos v. Northampton Cnty. Child Welfare Serv., 917 F. Supp. 2d 377, 389 (E.D. Pa.

2013) (dismissing discrimination claim were the plaintiff merely alleged that he was born in

Greece, he was qualified for the position he held with the defendant, he was discriminated

against on the basis of national origin, and the defendants blatantly treated employees born in the

United States more favorably; the complaint did not state any facts other than those conclusory

allegations and failed to set forth that the other employees were similarly situated or that they

were in fact treated differently under similar circumstances); Anh Truong v. Dart Container

Corp., No. Civ.A.09-3398, 2010 WL 4237944, at *3 (E.D. Pa. Oct. 26, 2010) (granting Rule

12(b)(6) dismissal where plaintiffs' bald assertions that "Defendant Dart Container discriminated

against the plaintiffs and treated them differently, disparately, wrongfully suspended, and

wrongfully discharged them because of their common native language, Vietnamese, their Asian race, color, ethnicity and Vietnamese nationality.  Defendant has a pattern and practice of disparate treatment and discrimination against nonwhite employees (because of their race, color, ethnicity, and/or nationality)" were nothing more than conclusory statements devoid of any actual underlying facts suggesting that their terminations had anything to do with race or national origin); Fitzpatrick v. Cnty of Monmouth, No. Civ.A.08-299, 2009 WL 2713951, at *4 (D.N.J. Aug. 24, 2009) ("Plaintiffs have failed to establish that Fitzpatrick's suspension from the Union was motivated in any way by racial animus, apart from the conclusory and self-serving allegation that, '[t]hese acts were motivated by racial animus.' . . . Such a 'legal conclusion couched as factual allegation' cannot form a basis of a discrimination claim."); Wilkins v. Bozzuto & Assocs., Inc., No. Civ.A.09–2581, 2009 WL 4756381, at *3 (E.D. Pa. Dec. 10, 2009) (dismissing plaintiff's section 1981 claim where plaintiff alleged, in conclusory fashion, that his firing was related to his race, based upon the race of his supervisor, his lack of knowledge of complaints filed regarding his work within the relevant time period, and the unverified race of the employee who was subsequently hired to replace him; the plaintiff did "not offer facts that suggest that he was treated differently in the performance of his employment contract than any individual of another race . . .").

The same holds true in the present case.  As set forth above, Plaintiff's Complaint consists of a litany of generalized recitations that the Union has more vigorously protected the rights of Caucasians over those of African Americans.  Plaintiff, however, fails to set forth a single fact on which such conclusory allegations are based.  The allegations of the Complaint are nothing more than Plaintiff's own opinion that the Union provides better services to Caucasians

in analogous situations without any factual support for a legal finding of racial discrimination. Indeed, he does not identify any scenario wherein a Caucasian union member facing allegations analogous to those of Plaintiff was provided with more effective or vigorous representation than Plaintiff.  Nor does Plaintiff make any effort to identify the race of the Union leaders who made the decisions regarding the type of representation Plaintiff would have.  Such bare allegations do not plausibly suggest that the plaintiffs are entitled to relief, and are insufficient to state a claim upon which relief can be granted.

### 4.   Whether Plaintiff's § 1981 Claim Amounts to Impermissible Claim Splitting of an Action that Should Have Been Brought under *Danao I*

"Claim-splitting," also known as the "rule against duplicative litigation[,] [has been described as] the 'other action pending' facet of the res judicata doctrine."  Prewitt v. Walgreens Co., No. Civ.A.12-6967, 2013 WL 6284166, at *4–5  (E.D. Pa. Dec. 2, 2013) (citing Power Integrations, Inc. v. Fairchild Semiconductor Int'l Inc., No. Civ.A.08–309, 2009 WL 2016436, at *3 (D. Del. July 9, 2009)).  "The longstanding rule against improper claim splitting prohibits a plaintiff from prosecuting his case piecemeal and requires that all claims arising out of a single alleged wrong be presented in one action."  Prewitt, 2013 WL 6284166, at *4.  The preclusion of a claim not only prohibits a plaintiff from filing duplicative suits and from circumventing an earlier ruling of the court, it is in keeping with "the rule that a plaintiff must bring suit against the same defendant on all claims that relate to the same conduct, transaction or event at the same time."  Id. (quoting Curtis v. Citibank. N.A., 226 F.3d 133, 139 (2d Cir. 2000)).   In the Third Circuit, a Plaintiff has "no right to maintain two separate actions involving the same subject matter at the same time in the same court against the same defendant."  Walton v. Eaton Corp.,

563 F.2d 66, 70 (3d Cir. 1997).  "The doctrine promotes judicial economy by protecting defendants from having to defend against multiple identical, or nearly identical, lawsuits and by protecting courts from having to expend judicial resources on piecemeal litigation."  Prewitt, 2013 WL 6284166, at *5.

Defendant argues that Plaintiff's discrimination claim against the Union arises out of the same facts regarding his February discharge for sleeping on the job.  Danao I was brought, in part, against the Union and alleged breach of the duty of fair representation.  That claim was dismissed as time-barred and Plaintiff appealed the decision to the Third Circuit, where the case is now pending.  Defendant now asserts that Plaintiff's efforts to bring the § 1981 claim against the Union via Danao II amounts to impermissible claim-splitting as that claim should have been brought in connection with Danao I.

This argument gives too broad a construction to the claim splitting doctrine.  As a primary matter, although the two suits asserted claims arising out of the Union's representation—or lack thereof—with respect to Plaintiff's termination for sleeping on the job, the cases involving entirely separate claims with entirely separate elements and entirely separate statutes of limitations.  Danao I raised the Union's breach of the duty of fair representation, which, under statute and Supreme Court precedent, was subject to the six-month statute of limitations prescribed in Section 10(b) of the National Labor Relations Act, 29 U.S.C. § 160(b).  DelCostello v. Int'l Bhd. of Teamsters, 462 U.S. 151, 172 (1983).  The statute of limitations begins to run when "the plaintiff knows or reasonably should have known of the acts contributing to the union's wrongdoing in failing to adequately represent the member's interests."  Podobnik v. U.S. Postal Serv., 409 F.3d 584, 593 (3d Cir. 2005) (citing Miklavic v. USAir, Inc., 21 F.3d

551, 556 (3d Cir. 1994)).  As this Court previously found in <u>Danao I</u>, Plaintiff knew or

reasonably should have known of the acts contributing to the Union's wrongdoing as of April 15,

2013, thereby giving him until October 15, 2013 to file a federal lawsuit.  <u>Danao II</u>'s claim under

42 U.S.C. § 1981, however, was not subject to a similar limitations period and, therefore, would

not have been subject to dismissal at that time.

That point leads to the more crucial reason why claim-splitting does not act as a bar in

this case.  <u>Danao I</u> is no longer pending in this Court.  By way of Order entered June 14, 2014,

<u>Danao I</u> was dismissed on statute of limitations grounds and it is currently pending on appeal to

the Third Circuit.  As a result, Plaintiff is not maintaining two separate actions on the same

subject matter at the same time in the same Court.  Rather, the case is in the same posture as if

the two claims were brought jointly—the dismissed claim is on appeal (which could have

happened if interlocutory appeal was granted) and the § 1981 claim remains pending in this

Court.  Should the Third Circuit remand <u>Danao I</u> for further proceedings, this Court may then

consider whether or not to consolidate the two cases.  At present, however, considerations of

judicial economy do not advocate in favor of dismissing the § 1981 claim under considerations of

claim-splitting.

### 5.  Conclusion as to the Union

As set forth above, Plaintiff's claims against the Union fail to state a claim upon which

relief may be granted.  Nonetheless, the Third Circuit has made clear that if a complaint is

subject to Rule 12(b)(6) dismissal, a district court must ordinarily permit a curative amendment

unless such an amendment would be inequitable or futile.  <u>Alston v. Parker</u>, 363 F.3d 229, 235

(3d Cir. 2004).  Dismissal without leave to amend is justified only on grounds of bad faith, undue

delay, prejudice, and futility.  Id. at 236.  This opportunity to amend must be offered, even if the plaintiff does not specifically make such a request.  Id. at 235.

Although Plaintiff, in this case, does not expressly request leave to file an amended complaint, the Court finds that such leave is warranted in this case.  Plaintif has not previously sought leave to amend and the Union has not set forth any contentions of bad faith, undue delay, prejudice, or futility.  Accordingly, the Court will grant Plaintiff twenty days in which to file an amended complaint properly setting forth a factual basis for his Title VII and § 1981 claims against the Union.  Plaintiff's failure or inability to do so will, upon proper motion by the Union, result in dismissal of any deficient claims with prejudice.

### B.      Defendant ABM's Motion to Dismiss and to Strike

Defendant ABM has also filed a Motion seeking a court order dismissing certain of Plaintiff's claims against it and striking portions of Plaintiff's Complaint.  Upon thorough review, the Court grants this Motion in part and denies it in part.

### 1.      Motion to Dismiss Claims Relating to Plaintiff's Prior EEOC Charges

Several of Plaintiff's claims relate to prior EEOC charges, filed by Plaintiff in 2007 and 2009.  Specifically, Count I asserts a claim for religious discrimination against ABM under Title VII; Count V asserts a claim against ABM, in part, under the Pennsylvania Human Relations Act for discrimination and/or retaliation based on religion; and Count II asserts a claim against ABM under the Americans With Disabilities Act based, in part, upon the disabilities of neck and back injuries, and alleged stress, anxiety, and depression.  Defendant now seeks to dismiss these claims as either untimely, unexhausted, or barred by a general release.

### a.    <u>Count I - Religious Discrimination Claim</u>

Count I of Plaintiff's Complaint alleges that Defendant ABM "intentionally treated Plaintiff in a discriminatory manner based on his religion, Hebrew Israelite, including subjecting him to a hostile work environment based on his religion, treating him in a discriminatory manner with respect to his conditions of employment, and terminating his employment."  (Compl. ¶ 53.) ABM now argues that the only time Plaintiff ever asserted a claim of religious discrimination before the EEOC was in the Charge of Discrimination he filed in 2007; no claim of religious discrimination was stated in either of the two Charges of Discrimination filed in 2012 and 2013, which give rise to the claims permitted in this lawsuit.  Accordingly, ABM seeks dismissal of this claim.

Plaintiff responds that his EEOC Intake Questionnaire suffices to document his charge of discrimination because it contains the necessary elements to formulate his charge, even though it was neither indicated on EEOC Form 5, nor documented exactly on the form as he wrote it on the Questionnaire.  Plaintiff avers that the Questionnaire, dated May 9, 2013, indicates his intent to claim religious discrimination, and that he cross-filed that claim with the PHRC.  As such, he asserts that this claim has been properly exhausted and should not be dismissed.

Plaintiff's argument is precluded by the Third Circuit's ruling in <u>Barzanty v. Verizon, PA, Inc.</u>, 361 F. App'x 411 (3d Cir. 2010).  In that case, the Third Circuit reiterated the well-established principle that "[b]efore filing a lawsuit, a plaintiff must exhaust her administrative remedies by filing a timely discrimination charge with the EEOC."  <u>Id.</u> at 413.  After a charge is filed, "the scope of a resulting private civil action in the district court is 'defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of

discrimination. . . .'"  Id. at 414 (quoting Hicks v. ABT Assoc., Inc., 572 F.2d 960, 966 (3d Cir. 1978) (further quotations omitted)).  Facing a claim of failure to exhaust administrative remedies on an alleged hostile work environment claim, the plaintiff in Barazanty attempted to use her answers to the EEOC Intake Questionnaire in which she alleged a "hostile work situation."  Id. at 415.  The Third Circuit rejected this argument, holding as follows:

> This she cannot do. The EEOC Charge Form and the Intake Questionnaire serve different purposes.  An Intake Questionnaire facilitates 'pre-charge filing counseling' and allows the Commission to determine whether it has jurisdiction to pursue a charge. . . .  Moreover, the Intake Questionnaire is not shared with the employer during the pendency of the EEOC investigation.   On the other hand, an EEOC Charge Form serves to define the scope of the Commission's investigation and to notify the defendant of the charges against it. . . .  A plaintiff cannot be allowed to transfer the allegations mentioned only in the questionnaire to the charge itself.  Not only would this be circumventing the role of the Commission, but it would be prejudicial to the employer.

Id. at 415.  Other courts have adhered to this same principle.  See, e.g., Noble v. Maxim Healthcare Serv., Inc., No. Civ.A.12–2227, 2012 WL 3019443, at *10 (D.N.J. July 24, 2012) (barring plaintiff from asserting hostile work environment and harassment claims where plaintiff included the claims in his Intake Questionnaire but not in his Charge of Discrimination); Carr v. N.J., No. Civ.A.09-913,  2010 WL 2539782, at *4 (D.N.J. June 17, 2010) ("[W]hile courts may construe a Charge liberally to determine the proper scope of a reasonable EEOC investigation and the ensuing litigation, they have declined to use the Intake Questionnaire for that purpose.").

In the present case, Plaintiff's 2012 and 2013 Charges of Discrimination alleged discrimination based only on retaliation and disability.  They contained no indication that Plaintiff was claiming religious discrimination.  Plaintiff may not now rely upon his Intake

Questionnaire in order to establish administrative exhaustion.[8]  Accordingly, the Court dismisses

Count I of the Complaint.

### b.     Count V - Religious Discrimination in Violation of PHRA

Count V of the Complaint alleges that ABM engaged in "discrimination and/or retaliation

based on religion and/or disability, and/or retaliation complaints," which violate the PHRA.

(Compl. ¶ 67.)  ABM now seeks dismissal of the religious discrimination aspect of this claim.

For the same reasons set forth above, the Court will dismiss Count II only to the extent it alleges

religious discrimination.

### c.     Count II - Americans With Disabilities Act Claim

Count II of the Complaint alleges that Plaintiff is disabled as a result of his neck and back

injury, his insomnia, and his stress, anxiety, and depression conditions.  (Compl. ¶ 56.)  Based on

those disabilities, ABM purportedly discriminated against Plaintiff in violation of the ADA and

ADAA.  (Compl. ¶ 58.)  Defendant ABM asserts, however, that Plaintiff's 2013 Charge of

Discrimination, which is the only Charge that alleges disability discrimination, avers that ABM

violated the ADA due only to Plaintiff's alleged disability of insomnia.  Plaintiff made no

mention of either his stress, anxiety, and depression conditions, or his neck and back injuries.

(Def. ABM's Mot. Dismiss, Ex. G.)

Again, pursuant to the Third Circuit's decision in Barzanty, Plaintiff's claim of disability

---

[8]  The cases cited by Plaintiff in support of his argument are inapposite.  The cases of Hicks v. ABT Assoc., Inc., 572 F.2d 960, 966 (3d Cir. 1978), Walter v. Heublein, 547 F.2d 466, 468 (8th Cir. 1976), and McAdams v. Thermal Indus., Inc., 428 F. Supp. 156 (W.D. Pa. 1977) dealt with the EEOC's own failures or improperly narrow investigations as opposed to the plaintiffs' failures to perfect their charges.  Edelman, as discussed above, only addressed the issue when a charge is deemed timely filed, not what the proper scope of that charge is.

discrimination—to the extent he bases it on either his stress, anxiety, and depression conditions, or his neck and back injuries—must be dismissed.  Plaintiff raised those disabilities only on his Intake Questionnaire, but never identified them as bases for his disability discrimination claim on the Charge itself.  Plaintiff does not allege that he attempted to amend his Charge to include these bases for discrimination.  In turn, neither the EEOC nor ABM were ever put on notice of those allegations, meaning that Plaintiff has not properly exhausted them.[9]

### d.  Whether the Continuing Violation Theory Preserves Plaintiff's Claims

In a last ditch effort to avoid the exhaustion bar on the foregoing three claims, Plaintiff argues that all of his allegations in his Charges of Discrimination filed in 2007 and 2009–including those of religious discrimination—should survive ABM's Motion to Dismiss under the continuing violations theory, despite the fact that they were filed more than 300 days prior to the initiation of this lawsuit.  The continuing violation theory is an exception to the general rule of when the statute of limitation begins to run in a discrimination action.  As the Third Circuit has explained,

> In employment discrimination suits, the proper focus of the statute of limitations inquiry "is on the time of the *discriminatory* act, not the point at which the *consequences* of the act become painful."  Chardon v. Fernandez, 454 U.S. 6, 8 (1981) (emphasis in original).  However, if the alleged discriminatory conduct is a "continuing violation," the statute of limitations begins to run on the date of the last occurrence of discrimination rather than the first.  Bronze Shields, Inc. v. New Jersey Dept. of Civ. Serv., 667 F.2d 1074 (3d Cir. 1981), cert. denied, 458 U.S. 1122 (1982).

---

[9]  ABM also alleges that to the extent Plaintiff seeks recovery under the ADA for an alleged workplace injury to his neck and back, that aspect of his claim is precluded by the workers' compensation exclusivity bar.  Having already found that these claims must be dismissed as unexhausted, the Court need not address this argument.

Miller v. Beneficial Mgmt. Corp., 977 F.2d 834, 842 (3d Cir. 1992).  "To successfully argue a

continuing violation theory, the plaintiff must show a present violation, i.e. one within the statute

of limitations period that is reasonably related to previous discriminating acts that, standing

alone, would be barred by the statute of limitations."  Clark v. Sears Roebuck & Co., 816 F.

Supp. 1064, 1069 (E.D. Pa. 1993).  Stated otherwise, to rely on the continuing violations theory,

a plaintiff must (1) "demonstrate that at least one act occurred within the filing period," and (2)

"establish that the conduct is 'more than the occurrence of isolated or sporadic acts,'" i.e., the

conduct must be 'a persistent, on-going pattern.'"  McAleese v. Brennan, 483 F.3d 206, 218 (3d

Cir. 2007) (quoting West v. Phila. Elec. Co., 45 F.3d 744, 754–55 (3d Cir. 1995)).  Moreover,

the continuing violations theory does not apply to injuries that occurred before the filing period if

the plaintiff was aware of those injuries at the time they occurred.  Morganroth & Morganroth v.

Norris, McLaughlin & Marcus, P.C., 331 F.3d 406, 417 n.6 (3d Cir. 2003).

   In the present case, Plaintiff asserts that:

> Here, it is clear that although he does not entitle any of the counts of the complaint
> as a hostile work environment, a fair reading of the complaint contains allegations
> of ongoing harassment based on plaintiff's protected classes, e.g., his race religion,
> and disability status (a hostile work environment).  Despite the fact that he was a
> good performer, upon announcing his religion in 2007, and requesting his Sabbath
> day off (Saturdays), ABM began to harass him. . . .  The treatment included open
> hostility, assigning him extra work, false criticisms of poor performance and
> surveillance.  As a result of this treatment, plaintiff filed charges of discrimination
> in 2007 and 2009, claiming religious discrimination and retaliation . . . . Despite the
> charges, ABM continued to discriminate and retaliate against plaintiff . . . . Plaintiff
> was fired in 2009 and reinstated after arbitration.  As a part of a settlement with
> ABM, it agreed to cease from further discriminate [sic] or retaliate [sic] against
> plaintiff. . . . However, ABM reneged on the settlement agreement, continuing to
> discriminate and/or retaliate against plaintiff, therefore breaching and invalidating the
> agreement.  Plaintiff cannot be bound by the terms of an agreement with ABM
> breached. [sic]

Although plaintiff does not specifically make claims of further discrimination until 2012, his averment that ABM again ramped up its discrimination and retaliation . . . contains a reasonable inference that the discrimination and retaliation never ceased (and if necessary, plaintiff seeks leave of the court to amend his complaint to add incidents of discrimination and/or retaliation which occurred between 2010 and 2012[)].  All of the acts that plaintiff complains of in his complaint, relate to an ongoing pattern of discrimination and/or retaliation, related to harassing him at work by unfair work assignments, surveillance, demeaning verbal conduct hostility, false write ups and mistreatment.

In plaintiff's EEOC Charge dated October 18, 2012, the block on EEOC form 5 for an ongoing violation is checked, therefore, plaintiff's claims beyond 300 days before October 18, 2012, should survive ABM's motion to dismiss. . . .  This charge was cross filed with the PHRC, therefore, his claim of a continuing violation under the PHRA should also survive this motion to strike and/or dismiss.

(Pl.'s Resp. Opp'n ABM's Mot. Dismiss 8–10.)

Plaintiff's continuing violation theory must fail.  Plaintiff was well aware of the injuries resulting from the allegations in the 2007 and 2009 EEOC Charges at the time he filed the claims.  Those Charges were resolved via Settlement Agreement and Release, with Plaintiff being rehired by ABM in 2010.  (Compl. ¶ 21.)  As indicated above, the continuing violations theory does not apply to injuries that occurred before the filing period if the plaintiff was aware of those injuries at the time they occurred.  Morganroth, 331 F.3d at 417 n.6.  Since Plaintiff has already pursued and received remedies for the prior discriminatory conduct and resulting injuries back in 2010, he may not now assert that such injuries are part of a continuing period of violations that spanned into 2013.  Furthermore, by his very own admission in the Complaint, after the 2010 settlement, ABM did not engage in any discriminatory or retaliatory acts until 2012, when he was under the supervision of a new supervisor and manager.[10]  (Id. ¶ 23.)

---

[10]  Plaintiff contends that although he does not specifically make claims of further discrimination until 2012, his averment that ABM again ramped up its discrimination and retaliation in 2012 contains a reasonable inference that the discrimination and retaliation never

Accordingly, Plaintiff cannot establish that the discriminatory action was part of a "persistent, on-going pattern."  West, 45 F.3d at 754–55.

Moreover, as noted by ABM, Plaintiff signed a General Release on December 16, 2010, in connection with his 2007 and 2009 Charges of Discrimination.  In that Release, Plaintiff agreed to waive all of his claims of employment discrimination and retaliation to date, including those raised in the 2007 and 2009 Charges.  (ABM's Mem. Supp. Mot. Dismiss, Ex. E.) Although Plaintiff has suggested—albeit indirectly—that ABM did not comply with the terms of that Release, Plaintiff has not brought a breach of contract claim or otherwise sought to invalidate this Release.  Moreover, Plaintiff does not address this portion of ABM's argument in his Response brief.  Bound by the terms of this Release, Plaintiff may not now reassert allegations of retaliation and discrimination occurring in 2007 and 2009 as part of his current lawsuit.

In short, the Court rejects Plaintiff's efforts to invoke the continuing violations theory to allow him to rely on incidents that are time-barred.  This portion of the Complaint is therefore dismissed.

### 2.    Motion to Dismiss Count VI for Wrongful Discharge

Defendant ABM next seeks dismissal of Count Six of the Complaint, which contends that as a result of his workplace injury, Plaintiff filed a worker's compensation claim for which he

---

ceased and that he would like to amend his Complaint to add incidents of discrimination and/or retaliation which occurred between 2010 and 2012.  The Court does not find that the Complaint allows for any such "reasonable inference."  Indeed, the opposite inference is far more viable from the allegations of the Complaint.  Moreover, as set forth below, given the settlement between ABM and Plaintiff stemming from the 2007 and 2009 incidents, Plaintiff is barred from relying on such incidents as part of a continuing violations theory.

was required to be out of work for approximately a month.  (Compl. ¶ 69.)  Shortly after his

return, ABM, who disputed the claim, fired Plaintiff on the basis that Plaintiff had allegedly

committed a work rule violation.  (Id.)  Plaintiff therefore avers that ABM violated the public

policy of Pennsylvania for terminating his employment in retaliation for filing the worker's

compensation claim.

      Although a discharged at-will employee usually has no cause of action against his or her

employer for wrongful termination, the Pennsylvania Supreme Court has recognized a wrongful

termination cause of action for at-will employees in cases involving violations of Pennsylvania's

"public policy."  Shick v. Shirey, 716 A.2d 1231, 1237–1238 (Pa. 1998).  The cause of action

exists only where the public policy of Pennsylvania "is implicated, undermined, or violated

because of the employer's termination of the employee."  McLaughlin v. Gastrointestinal

Specialists, Inc., 750 A.2d 283, 289 (Pa. 2000).  Notably, however, the Pennsylvania common

law wrongful discharge cause of action that is available to a Pennsylvania at-will employee does

not extend to a contractual or union-represented employee.  Harper v. Am. Red Cross Blood

Servs., 153 F. Supp. 2d 719, 721 (E.D. Pa. 2001); Phillips v. Babcock & Wilcox, 503 A.2d 36,

36-38 (Pa. Super. Ct. 1986).  Unlike an at-will employee, a union-represented employee need

not—and may not—resort to the claim of wrongful discharge in the event of termination, but

rather may challenge a discharge or other adverse employment decision by relying on the

grievance procedures contained in the collective bargaining agreement.  Raczkowski v. Empire

Kosher Poultry, Inc., No. Civ.A.04-312, 2005 WL 1273591, at *3 (M.D. Pa. May 27, 2005).

      In the present case, Plaintiff avers that he was a dues-paying member in good standing of

the Union.  (Compl. ¶ 10.)  Further, according to the Complaint, Plaintiff availed himself of the

protections available through his Union and the collective bargaining agreement.  (Id. ¶ 33.)
Plaintiff—having not responded to ABM's Motion to Dismiss this claim—offers no alternative
basis on which he can proceed on a wrongful termination claim.  Accordingly, this claim must be
dismissed.

### 3.      Motion to Strike

In connection with its Motion to Dismiss, Defendant ABM also seeks to strike certain
allegations from Plaintiff's Complaint.  Rule 12(f) of the Federal Rules of Civil Procedure
provides that "the court may order stricken from any pleading any insufficient defense or any
redundant, immaterial, impertinent or scandalous matter."  Fed. R. Civ. P. 12(f).  Content is
immaterial when it "has no essential or important relationship to the claim for relief."  Donnelly
v. Commonwealth Fin. Sys., No. Civ.A.07-1881, 2008 WL 762085, at *4 (M.D. Pa. March 20,
2008) (citing Delaware Healthcare, Inc. v. MCD Holding Co., 893 F. Supp. 1279, 1291–92 (D.
Del.1995)).  Content is impertinent when it does not pertain to the issues raised in the complaint.
Id. (citing Cech v. Crescent Hills Coal Co., No. Civ.A.96-2185, at *28 (W.D. Pa. July 25, 2002)).
Scandalous material "improperly casts a derogatory light on someone, most typically on a party
to the action."  Id. (citing Carone v. Whalen, 121 F.R.D. 231, 233 (M.D. Pa. 1988)).

"The standard for striking a complaint or a portion of it is strict, and 'only allegations that
are so unrelated to the plaintiffs' claims as to be unworthy of any consideration should be
stricken.'"  Steak Umm Co., LLC v. Steak'Em Up, Inc., No. Civ.A.09-2857, 2009 WL 3540786,
at *2 (E.D. Pa. Oct. 29, 2009) (citing Johnson v. Anhorn, 334 F. Supp. 2d 802, 809 (E.D. Pa.
2004)).  "The purpose of a motion to strike is to clean up the pleadings, streamline litigation, and
avoid unnecessary forays into immaterial matters."  McInerney v. Moyer Lumber and Hardware,

<u>Inc.</u>, 244 F. Supp. 2d 393, 402 (E.D. Pa. 2002).  Although "[a] court possesses considerable

discretion in disposing of a motion to strike under Rule 12(f)," such motions are "not favored and

usually will be denied unless the allegations have no possible relation to the controversy and may

cause prejudice to one of the parties, or if the allegations confuse the issues in the case."  <u>River</u>

<u>Road Dev. Corp. v. Carlson Corp.</u>, No. Civ.A.89-7037, 1990 WL 69085, at *3 (E.D. Pa. May 23,

1990).  To prevail, the moving party must demonstrate that "the allegations have no possible

relation to the controversy and may cause prejudice to one of the parties, or [that] the allegations

confuse the issues."  <u>Id.</u> (citing 5C C. Wright & A. Miller, <u>Federal Practice and Procedure</u>, §

1382, at 809–10, 815 (1969)).  Motions to strike are to be decided "on the basis of the pleadings

alone."  <u>North Penn Transfer, Inc. v. Victaulic Co. of Am.</u>, 859 F. Supp. 154, 159 (E.D. Pa.

1994) (citations omitted).  Striking a pleading or a portion of a pleading "is a drastic remedy to

be resorted to only when required for the purposes of justice."  <u>DeLa Cruz v. Piccari Press</u>, 521

F. Supp. 2d 424, 428 (E.D. Pa. 2007) (quotations omitted).

 ABM currently seeks to strike three sets of allegations from the Complaint: (1)

allegations regarding events that precede the December 2010 General Release and relate to prior

charges of discrimination from 2007 and 2009; (2) allegations supporting Plaintiff's ADA claim

in Count II and wrongful discharge claim in Count VI, and which claim that negligent training

caused Plaintiff's alleged neck and back injuries; and (3) allegations relating to unemployment

compensation proceedings and alleged unpaid working time.  The Court addresses each set of

allegations individually.

a.    **Allegations Regarding 2007 and 2009 Charges of Discrimination**

ABM first moves to strike allegations of religious discrimination and allegations

pertaining to the 2007 and 2009 Charges of Discrimination.  Specifically, ABM asserts that the

actionable claims in this matter are restricted to those arising out of the 2012 and 2013 Charges

of Discrimination, which, on their face, asserted claims only for retaliation and disability

discrimination based on insomnia.  Therefore, according to ABM, the allegations in the

Complaint relating to alleged religious discrimination, and the 2007 and 2009 Charges of

Discrimination—those in Paragraphs 14–21, 41, 52–54, and part of 67—are of no relevance,

serve to confuse issues, and are otherwise prejudicial.

Plaintiff responds that these allegations constitute background information that is relevant

to ABM's motivation for its actions against Plaintiff.  Such information, according to Plaintiff, is

critical to determine whether discrimination could have motivated ABM's decisions.

Given the general principle that striking a pleading is a drastic remedy to be used

sparingly, the Court declines to grant this portion of ABM's Motion.  While ABM correctly notes

that retaliation and disability discrimination are no longer substantive claims in this case, the

background information relevant to Plaintiff's prior charges of discrimination may indeed have

some relevance to whether Plaintiff's current claims of discrimination have merit.  Stated

differently, even though Plaintiff's claims are restricted to disability discrimination and

retaliation, Plaintiff alleges a general environment of discrimination and harassment at ABM,

which may be substantiated by such allegations.  The early stages of this case make it difficult for

the Court to foresee whether factual allegations related to previous discrimination charges, based

on other protected traits, may later bear on the merits of this case.  Moreover, ABM has not

clearly shown that such allegations will prejudice it or otherwise confuse the issues.  Thus, the

Court declines to strike these allegations at this juncture.[11]

> **b.    Allegations Supporting Plaintiff's ADA Claim in Count II and Wrongful Discharge Claim in Count VI, and Which Claim that Negligent Training Caused Plaintiff's Alleged Neck and Back Injuries**

As noted above, Plaintiff has improperly based his ADA claim upon allegations of

disabilities other than the alleged disability of insomnia, which was the sole basis for the claim as

---

[11]   ABM asserts that "in numerous employment cases, district courts have been scrupulous in excising allegations extraneous to and not directly informing the discrete claims asserted since such allegations confuse the issues and are otherwise prejudicial."  (Def. ABM's Mem. Supp. Mot. to Dismiss 14.)  In support, it cites numerous cases, as follows.  See Bloom v. Shalom, No. Civ.A.13-1442, 2014 WL 356624, at *3–4 (W.D. Pa. Jan. 31, 2014) (striking allegations regarding sexual harassment and a sexually hostile work environment where plaintiff's claims alleged only that she was treated differently than her male counterparts in terms of wages, terms, conditions, rights, and privileges of employment); Siler v. Cmty. Educ. Ctrs., Inc., No. Civ.A.14-5019, 2014 WL 4931291, at *4 & n.5 (E.D. Pa. Oct. 2, 2014) (striking allegations in complaint that white officers mistreated inmates and other African American officers since such allegations had no bearing on the discrimination or hostile environment that the plaintiff personally experienced at the hands of defendant); Sube v. City of Allentown, 974 F. Supp. 2d 754, 770–71 (E.D. Pa. 2013) (in a case alleging failure to accommodate under the ADA and retaliation, declining to strike allegations regarding chief officer's negative views of ADA and officers who seek protection thereunder; but striking allegations showing an alleged lack of policy governing suspension or termination since plaintiff had not raised either a disparate treatment claim or a hostile work environment claim); Hildebrand v. Allegheny Cnty., No. Civ.A.12-1122, 2012 WL 6093798, at *8–9 (W.D. Pa. Dec. 7, 2012) (in a case alleging First Amendment and Whistleblower claims, striking allegations regarding defendant's political wrongdoing as confusing the actual issues), vacated in part 757 F.3d 99 (3d Cir. 2014).

The cases that ABM cites in support, however, are distinguishable.  As a primary matter, in each of the foregoing cases, the courts recognized that motions to strike should not be granted lightly.  Moreover, the courts in each case found that the stricken allegations were so unrelated to the claims at issue as to be either prejudicial or confusing to the jury.  In the present case, the allegations relating to Plaintiff's 2007 and 2009 Charges of Discrimination are not cognizable as substantive claims only because they are time barred, but they are nonetheless potentially relevant to ABM's possible motive for retaliating against Plaintiff in 2012 or otherwise discriminating against him because of his disability.

set forth in his 2012 Charge of Discrimination with the EEOC.  More specifically, in his

Complaint, Plaintiff further alleges that his "neck and back injury was due, in at least part, to

ABM's failure to properly train him to perform his assigned duties," and that "Plaintiff is

disabled as a result of his neck and back injury, his insomnia, and his stress, anxiety and

depression conditions."  (Compl. ¶¶ 30, 56.)  ABM now seeks to strike such allegations from the

Complaint as irrelevant.

On this point, the Court agrees in part.  To the extent Plaintiff asserts that his neck and

back injuries were caused by ABM's negligence, he is precluded from making any such argument

under the workmen's compensation exclusivity bar.  Pennsylvania's Workmen's Compensation

scheme provides the exclusive remedy available to employees against employers for work-related

injuries:

> The liability of an employer under this act shall be exclusive and in the place of any
> and all other liability to such employees . . . or anyone otherwise entitled to damages
> in any action at law or otherwise on account of any injury or death as defined in
> section 301(c)(1) and (2) or occupational disease as defined in section 108.

77 Pa. Cons. Stat. § 481(a) (1992).  As such, the employer is relieved of any and all liability for

work-related injuries.  In turn, allegations suggesting ABM's liability for Plaintiff's injuries have

no possible relation to any issue before the Court and will confuse the issues in this case.

Therefore, the Motion to Strike Paragraph 30 is granted.

The same holds true with respect  to Plaintiff's allegations that he was disabled as a result

of stress, depressive, and anxiety disorders.  (Compl. ¶¶ 6, 56.)  As detailed above, Plaintiff may

only proceed on his disability discrimination claim to the extent he asserts disability based on his

insomnia disorder.  In turn, any allegation that he was "disabled" as a result of his mental

disorders is legally inaccurate and impertinent to the action.  Thus, the Motion to Strike

Paragraph 56 and the portion of Paragraph 6 referencing the mental disorders is granted.[12]

With regards to Paragraphs 26–29 of the Complaint, however, the Court declines to strike

these allegations.  While these allegations discuss Plaintiff's neck and back injuries, as well as

his treatment for stress, anxiety, and depression, they make no allegation that ABM was liable for

such conditions or that these conditions were a basis for his alleged "disability."  Rather, these

allegations provide background information regarding Plaintiff's employment and medical leave

history with ABM, information that could potentially bear on the issues in this case.   Moreover,

to the extent Plaintiff asserts that his stress, anxiety, and depressive conditions were caused by

ABM's alleged discriminatory treatment, Plaintiff may properly raise such claims as an element

of damages.  Thus, the Court shall not strike these paragraphs.

### c.   Allegations Relating to Unemployment Compensation Proceedings and Alleged Unpaid Working Time

Lastly, ABM seeks to strike the following three allegations from the Complaint:

36.   As a routine part of his performance, Plaintiff would start his preparation for work 4–10 minutes early each day, which was known to ABM, by way of its time punch cards, but ABM did not give Plaintiff overtime for that accumulation of work over a course of time; In June 2012, ABM harassed Plaintiff by keeping him after work, without payment, violating fair labor standards.

37.   Plaintiff also routinely worked past the end of his shift to complete work, which his superiors requested, and had to file an eventual grievance through the Union, the result of which was a payment of four hours of overtime in June 2012.

. . .

---

[12]   Plaintiff asks the Court to take "judicial notice" that his disability of insomnia is so closely related to his claim of disability by stress, anxiety, and depression that ABM had notice that he was suffering from such conditions.  This is not a proper subject for judicial notice.

46.    ABM also knew that Plaintiff fell asleep due to his insomnia, his disability, and that he did not intend to fall asleep; ABM refused to offer Plaintiff a reasonable accommodation, after he informed it of his insomnia, and provided medical proof thereof, including refusing to engage in an interactive process as required under the Americans Disabilities Act As Amended (ADAA); ABM knew that it could have accommodated Plaintiff, by at a minimum, by not firing him for an incident that was caused by his disability; to further harass Plaintiff, ABM challenged his receipt of unemployment compensation, however the Unemployment Compensation Referree [sic] ruled that he was eligible for compensation because he should not have been fired for a first incident of accidentally falling asleep; ABM previously challenged Plaintiff's receipt of unemployment compensation in 2010, although it knew it had fired Plaintiff based on unjustified discriminatory and retaliatory reasons, resulting in Plaintiff having to pay back $4,383 in benefits he had received prior to ABM's challenge of his application for unemployment benefits.

(Compl. ¶¶ 36–37, 46.)  ABM now contends that these allegations should be stricken as immaterial since Plaintiff has no wage-related claims in this matter and none of the allegations are relevant to or inform any claim present.

The Court must again disagree.  The third element of a prima facie case of employment discrimination requires a showing of a causal connection between the plaintiff's status in a protected class or involvement in a protected activity and an action that might have dissuaded a reasonable worker from making or supporting a charge of discrimination.  Moore v. City of Phila., 461 F.3d 331, 341–42 (3d Cir. 2006).  To determine whether a plaintiff has met the causation element, the court must consider all evidence that is "potentially probative of causation."  Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 (3d Cir. 2000).  Generally, temporal proximity of a retaliatory act to a protected activity is probative, but not dispositive of the causation element.  Estate of Smith v. Marasco, 318 F.3d 497, 512–13 (3d Cir. 2003).  "[I]n cases where temporal proximity is not 'unusually suggestive' of retaliatory motive, the Third

Circuit has demanded further evidence to substantiate a causal connection."  McCloud v. United

Parcel Serv., Inc., 543 F. Supp. 2d 391, 401–02 (E.D. Pa. 2008).  "Such other evidence may

include, but is not limited to, a 'pattern of antagonism' by the employer that could link the

adverse action with Plaintiff's complaint."  Id.   The Third Circuit has specifically remarked that,

absent the unduly suggestive temporal proximity, a causal link between protected activity and

adverse action may be inferred from "an intervening pattern of antagonism following the

protected conduct, or the proffered evidence examined as a whole."  Peace-Wickham v. Walls,

409 F. App'x 512, 522 (3d Cir. 2010).

While Plaintiff clearly has no wage-related claims in his case—and thus could not assert

an entitlement to unpaid wages—his allegations of not being paid for overtime or of ABM

challenging his right to unemployment compensation could be used to show a "pattern of

antagonism."  Stated differently, Plaintiff may rely on these facts to establish a causal link

between his disability/protected activity and his ultimate termination from ABM.  Because ABM

cannot demonstrate that these allegations have no possible relation to the controversy, or that the

allegations confuse the issues, the Court declines to grant the Motion to Strike.

### 4.      Conclusion as to Defendant ABM's Motion to Dismiss/Strike

For all of the foregoing reasons, the Court grants ABM's Motion to Dismiss and/or Strike

in part and denies it in part.  First, with respect to (a) Plaintiff's religious discrimination claims in

Counts I and V and (b) Plaintiff's Americans With Disabilities Act claim in Count II to the

extent it claims disability due to stress, anxiety, and depression conditions, ABM's Motion to

Dismiss is granted for failure to exhaust administrative remedies.  Second, Plaintiff's claim for

wrongful discharge is dismissed because such a claim is unavailable to a union-represented

43

employee.  Third and finally, the Court grants ABM's Motion to Strike Paragraphs 30, 56, and the portion of Paragraph 6 referencing disability due to stress, anxiety and depression; but denies the Motion to Strike  in all other respects.

An appropriate Order follows.