**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| VINCENT DANAO | : | |
| | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | NO. 14-6621 |
| ABM JANITORIAL SERVICES | : | |
| AND LOCAL 32BJ SEIU | : | |
| | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM**

BUCKWALTER, S. J.                                                    October  7, 2015

Currently pending before the Court is Defendant Local 32BJ, Service Employees

International Union's ("Union"'s) Motion to Dismiss Plaintiff's Amende Complaint.  For the

following reasons, the Motions is denied.

## I.    FACTUAL BACKGROUND

According to the allegations in the Amended Complaint Complaint, Plaintiff Vincent

Danao "is of the African American or Black race and is disabled by virtue of his impairment,

insomnia." (Am. Compl. ¶ 6.)  Starting in 1999, Plaintiff was primarily employed by Defendant

ABM Janitorial Services ("ABM") as a Class II Janitor and, at all relevant times, Plaintiff was a

dues-paying member of his Union, Defendant Local 32 BJ SEIU (the "Union"), in good standing.

(Id. ¶¶ 8–9.)  During his employment with ABM, Plaintiff received several accolades for good

performance, several pay raises, and a promotion to ABM supervisor.  (Id. ¶¶ 11, 13.)  Plaintiff

also served as a shop steward for the Union during part of his employment for ABM.  (Id. ¶ 12.)

In 2007 and 2009, Plaintiff filed charges against his employer with the Equal

Employment Opportunity Commission ("EEOC"), alleging discrimination based on his religion and retaliation for complaining of discrimination.  (Id. ¶ 14.)  He asserted that his supervisors began scrutinizing him in a manner in which it did not scrutinize others outside his religion, including surveilling Plaintiff via close circuit television.  (Id. ¶ 14.)

In 2009, ABM fired Plaintiff based on falsely-alleged poor performance.  (Id. ¶ 15.)  As a result of Plaintiff's complaint to the Pennsylvania Human Resources Commission ("PHRC"), however, the case was settled and Plaintiff was rehired with a promise by ABM to not retaliate against him.  (Id.)  In addition, Plaintiff's former supervisor was require to attend an anger management class.  (Id. ¶ 16.)

Between 2007 and 2013, Plaintiff filed four complaints of unfair labor practices against the Union for its alleged failure to properly represent him during the grievance process in his conflicts with ABM.  (Id. ¶ 17.)  Among his complaints against the Union were that "it treated him differently and inferior to similarly situated Caucasian union members, in terms of the attention it would give to his grievances, as well as its willingness to arbitrate his grievances, for alleged performance and disciplinary issues, which were falsely charged by ABM."  (Id. ¶ 18.)

In 2012, Plaintiff alleges that he faced more discriminatory and retaliatory treatment by ABM through his new supervisor, Ms. Velez.  (Id. ¶ 19.)  This treatment included assigning Plaintiff an excessive workload in comparison with his peers who were not members of his protected classes; refusing to provide him with a definitive work description, leaving him in confusion as to what his duties and work areas were for around seven months; screaming at him; monitoring him while he was in the men's room; repeatedly threatening to suspend him based on false allegations of poor performance; and repeatedly writing him up for falsely alleged poor

performance.  (Id.)  As a result, Plaintiff began to develop stress, anxiety, insomnia, and depression symptoms for fear that Ms. Velez was attempting to orchestrate his firing.  (Id. ¶ 20.) He received professional treatment from a psychologist for his insomnia, and he required medication to combat his insomnia, stress, anxiety, and depression.  (Id. ¶ 20–22.)  Plaintiff then requested a disability accommodation in the form of a transfer to a new work location, which ABM denied.  (Id. ¶ 23.)  ABM allegedly failed to engage Plaintiff in an interactive process to attempt to accommodate his disability, with the knowledge that the stress imposed in his work environment would exacerbate his insomnia.  (Id. ¶ 24.)

On October 16, 2012, Plaintiff injured his neck and back at work while performing his duties, and was required to take off for approximately thirty days.  (Id. ¶ 25.)  Plaintiff asserts that his injury was based, in part, on ABM's intentional refusal to properly train him for his duties.  (Id. ¶ 28.)  Plaintiff also needed time off as a result of stress, anxiety, and depression. (Id. ¶ 25.) ABM initially fought his claim for worker's compensation benefits.  (Id.)

After November 12, 2012, Plaintiff required continued treatment for his conditions.  (Id. ¶ 27.)  Nonetheless, Ms. Velez, repeatedly assigned him more work than similarly-situated employees who were not members of his protected classes.  (Id. ¶ 29.)  In addition, ABM intentionally refused to give him credit for overtime for work that he routinely did before the start of his shift.  (Id. ¶ 30.)

In November 2012, Ms. Velez suspended Plaintiff for three days based on the false allegation that he had not completed work on October 16, 2012.  (Id. ¶ 31.)  Specifically, she claimed that he had left work undone on that date, even though ABM's practice and procedure was to do daily inspections at the end of each shift to ensure that the work was properly done.

(Id. ¶ 31.)  Although ABM purportedly knew that Ms. Velez's imposed suspension was invalid, it endorsed it and used it as a basis for Plaintiff's eventual termination.  (Id. ¶ 32.)  Aside from the suspension, Ms. Velez repeatedly hollered at Plaintiff and attempted to verbally demean and belittle him; assigned Plaintiff more work that similarly situated employees; and refused to properly train Plaintiff for his duties.  (Id. ¶¶ 33–35.)

On February 20, 2013, Plaintiff fell asleep during his work break, as a result of his insomnia which was known to Defendants.  (Id. ¶ 36.)  At the time of the incident, Plaintiff's immediate supervisor took a photograph of him.  (Id. ¶ 39.)  As a result, ABM immediately suspended Plaintiff for three days and then terminated his employment on February 27, 2013. (Id. ¶ 37.)  ABM justified its termination of Plaintiff based on other alleged disciplinary infractions, which, according to ABM's policy, should not have been combined to justify his termination.  (Id. ¶ 40.)  ABM was in possession of Plaintiff's medical documentation of his insomnia prior to the incident on February 20, 2013, but refused to engage in an interactive process to attempt to accommodate Plaintiff.  (Id. ¶ 42.)  ABM then challenged Plaintiff's receipt of unemployment compensation benefits under the theory that the incident on February 20, 2013 was willful misconduct.  (Id. ¶ 43.)

Plaintiff filed several grievances against ABM through the Union.  (Id. ¶ 55.)  Plaintiff complained about the level and quality of the Union's representation of him, including that it assigned some of his grievances to lower level shop stewards rather than its several experienced and better qualified attorneys.  (Id.)  On one occasion in late 2012, when ABM was ramping up its alleged discriminatory and retaliatory treatment, District Leader Mr. MacManiman, a Caucasian man, angrily told Plaintiff that he did not care that Plaintiff was dissatisfied with his

level and quality of representation, and that if he wanted, he could sue the Union. (Id. ¶ 56.) Plaintiff complained about the Union's failure to properly represent him in/around late 2012 or early 2013, including the fact that Mr. MacManiman's Caucasian assistant, Tom Smith, was refusing to assist him in controverting allegations of improper performance and in putting forth Plaintiff's allegations of unequal workload and intentionally-undefined duties. (Id. ¶ 57.) Mr. Smith angrily told Plaintiff that he should stop complaining, but reluctantly went to Plaintiff's work location after ABM's General Counsel authored a letter to Plaintiff dated January 15, 2013. (Id.)

Plaintiff alleges—upon the observations of both former Union members Yvette Spencer and "Gimeling"—that Mr. MacManiman and Mr. Smith used ongoing racial slurs, racial jokes, and/or racial remarks during the relevant time period for this Amended Complaint, in which they referred to African Americans as "monkeys" or "flying monkeys." (Id. ¶ 58.) Although Ms. Spencer was one of the Union's best staffers, Mr. MacManiman intentionally fired her on the false basis that she had not gone to a particular building. (Id. ¶¶ 59–60.) Ms. Spencer believed that the firing was racially motivated since Mr. MacManiman had fired a series of good and competent Union employees and replaced them with Caucasian employees. (Id. ¶ 60.) The African American staffers who were fired—who Plaintiff refers to as "Jackie," "Leo," and "Karen"—were replaced with Caucasian staffers. (Id. ¶ 61.) On one occasion during the relevant time period, Ms. Spencer had a verbal disagreement with Mr. MacManiman about a Union matter, and he angrily approached her and acted as if he was going to strike her. (Id. ¶ 62.) After Ms. Spencer was fired, she complained to MacManiman and to the Department of Labor that her termination was based on racial discrimination. (Id. ¶ 63.) Ms. Spencer allegedly

observed that MacManiman and Smith had a plan to replace African American staffers with Caucasian staffers and noticed that MacManiman had a penchant for backing management against Union members, including Plaintiff.  (Id. ¶ 64–66.)

For purposes of his Step Three Grievance Hearing to preserve his employment, in/around April 2013, Plaintiff was supposed to have been represented by the Union's best trial attorney, James Runkel, who is Caucasian.  (Id. ¶ 68.)  At the last minute, however, Plaintiff was informed that he would be represented by a newly-hired lawyer, who refused to advance ABM's policy that it could not fire Plaintiff under its written policies for a first-time offense of falling asleep.  (Id. ¶¶ 68–69.)  Indeed, Runkel would not meet him face to face, and when he did, he was "abrupt, arrogant and standoffish."  (Id. ¶ 79.)  The Union did not adequately prepare Plaintiff for the hearing and refused to use informal means to preserve Plaintiff's job such as publicity and rallying.  (Id. ¶ 70.)  Conversely, the Union created a flyer on behalf of a Caucasian janitor—Bianca Mandia—and held three rallies to preserve her employment.  (Id. ¶ 71.)  The Union also worked hard to stop the termination of two other Caucasian employees, possibly before a Third Step Hearing.  (Id. ¶ 72.)

Plaintiff alleges that multiple other African American Union members were treated disproportionately by the Union.  Union member Gimeling, a janitor, was not given legal counsel by the Union, despite the fact that she was a dues-paying member, resulting in her ultimate termination in 2014 based on a false allegation of poor performance and/or misconduct.  (Id. ¶¶ 73–75.)  Union member Quentin told the Union, in 2009, that he was being harassed at work by ABM and that he was unfairly terminated, but the Union refused to grieve the termination.  (Id. ¶ 77.)  According to Ms. Forbes, another long-time Union staffer, Mr. Runkel had a reputation

within the Union of preferring to represent Caucasian members over African Americans.  (Id. ¶ 78.)

Plaintiff filed two cases against Defendants ABM and the Union.  His first—filed in state court but subsequently removed to federal court—set forth the same operative facts, but asserted two causes of action: (1) a breach of duty of fair representation claim against the Union due to the Union's failure to make a particular argument when presenting the contractual grievance challenging his discharge; and (2) a breach of contract claim against both the Union and ABM, claiming that ABM violated the terms of the Collective Bargaining Agreement by terminating Plaintiff for a first incident of sleeping on the job, and that the Union violated the agreement by breaching its duty of fair representation.  (Compl., Denao v. 32BJ, SEIU and Mid Atl. Inc. (ABM Janitorial Services), No. Civ.A.13-7266 ("Danao I").)[1]  This Court dismissed the entire action against both Defendants, and Plaintiff appealed only the dismissal as it pertained to the Union. Denao v. Serv. Emps. Int'l Union, Local 32BJ, No. 14-3233.

Plaintiff filed the current suit in federal court on November 13, 2014 ("Danao II").  On February 11, 2015, Defendant ABM filed a Motion to Strike and Motion to Dismiss, and Defendant the Union filed a Motion to Dismiss.  Following the Court's dismissal without prejudice of the entire action against the Union, Plaintiff filed an Amended Complaint on June 19, 2015, setting forth the following causes of action: (1) disability discrimination in violation of the ADA and ADAA as to Defendant ABM; (2) retaliation as to Defendant ABM in violation of Title VII, the ADAA, and the ADA; (3) racial discrimination in violation of 42 U.S.C. § 1981 as

---

[1]  In the first lawsuit, Plaintiff spelled his last name as "Denao," and the case was captioned as such.  In this suit, Plaintiff has spelled his name "Danao," which is the spelling Defendants have in their records.

to Defendant ABM; (4) violation of the PHRA as to Defendant ABM; (5) violation of Title VII for racial discrimination as to Defendant Local 32 BJ SEIU; and (6) violation of 42 U.S.C. § 1981 for racial discrimination as to Defendant Local 32 BJ SEIU.

On July 10, 2015, the Union field a Motion to Dismiss Plaintiff's Amended Complaint. Plaintiff responded on August 7, 2015, making the Motion ripe for judicial consideration.

## II.    STANDARD OF REVIEW

Under Rule 12(b)(6), a defendant bears the burden of demonstrating that the plaintiff has not stated a claim upon which relief can be granted.  Fed. R. Civ. P.12(b)(6); see also Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005).  In Bell Atlantic Corporation v. Twombly, 550 U.S. 544 (2007), the United States Supreme Court recognized that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 555. Following these basic dictates, the Supreme Court, in Ashcroft v. Iqbal, 556 U.S. 662 (2009), subsequently defined a two-pronged approach to a court's review of a motion to dismiss.  "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id. at 678.  Thus, although "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."  Id. at 678–79.

Second, the Supreme Court emphasized that "only a complaint that states a plausible claim for relief survives a motion to dismiss."  Id. at 679. "Determining whether a complaint

states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. A complaint does not show an entitlement to relief when the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct. Id.; see also Phillips v. Cnty. of Allegheny, 515 F.3d 224, 232–34 (3d Cir. 2008) (holding that: (1) factual allegations of complaint must provide notice to defendant; (2) complaint must allege facts suggestive of the proscribed conduct; and (3) the complaint's "'factual allegations must be enough to raise a right to relief above the speculative level.'" (quoting Twombly, 550 U.S. at 555)).

Notwithstanding these new dictates, the basic tenets of the Rule 12(b)(6) standard of review have remained static. Spence v. Brownsville Area Sch. Dist., No. Civ.A.08-626, 2008 WL 2779079, at *2 (W.D. Pa. July 15, 2008). The general rules of pleading still require only a short and plain statement of the claim showing that the pleader is entitled to relief and need not contain detailed factual allegations. Phillips, 515 F.3d at 233. Further, the court must "accept all factual allegations in the complaint as true and view them in the light most favorable to the plaintiff." Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006). Finally, the court must "determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Pinkerton v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002).

## III. DISCUSSION

The Union has now filed its second Motion to Dismiss the Title VII and § 1981 claims against it. The Court considers each claim individually.

### A. Title VII Claim

As set forth in the Court's prior Memorandum, under Title VII, unions are prohibited

from discriminating on the basis of a protected status for the same reasons as employers.

McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 285 (1976); Watson v. Dept. of Servs. for Children, Youths and Their Families Delaware, 932 F. Supp. 2d 615, 622 (D. Del. 2013)  To establish a prima facie case in this context, a plaintiff must show (1) a violation of the collective bargaining agreement with respect to the plaintiff; (2) the union permitted the violation to go unaddressed, thereby breaching its duty of fair representation; and (3) some indication that the union's actions were motivated by some discriminatory animus.  Lopresti v. Cnty of Lehigh, No. Civ.A.12-6281, 2014 WL 1885278, at *6 (E.D. Pa. May 12, 2014) (citing Young v. Local 1201, Firemen & Oilers Union, No. Civ.A.07–3576, 2009 WL 3152119, at *4 (E.D. Pa. Sept. 25, 2009), aff'd, 419 F. App'x 235 (3d Cir. 2011)).  "The deliberate choice not to process grievances" can, under certain circumstances, violate Title VII.  Goodman v. Lukens Steel Co., 777 F.2d 113, 127 (3d Cir. 1985).

Like its prior Motion to Dismiss, the Union now contends that, notwithstanding Plaintiff's new allegations, the Amended Complaint fails to establish either that the Union breached its duty of fair representation or that the Union's actions were motivated by racial animus.[2]  Given Plaintiff's amended allegations which the Court must accept as true at this stage of the litigation, the Union's Motion to Dismiss must be denied.

### a.    Breach of Duty of Fair Representation

A union may breach its duty of fair representation if its actions are "arbitrary, discriminatory, or in bad faith." Air Line Pilots Ass'n, Int'l v. O'Neill, 499 U.S. 65, 67 (1991)

---

[2] Notably, the Union advances no argument about whether ABM breached the collective bargaining agreement.  For purposes of this Motion, the Court will assume that such a breach occurred.

(quoting <u>Vaca v. Sipes</u>, 386 U.S. 171, 190 (1967)).  "[A] union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' as to be irrational."  <u>Id.</u> (quoting <u>Ford Motor Co. V. Hoffman</u>, 345 U.S. 330, 338 (1953)).  When considering whether a union's actions fall within that range, courts "must be highly deferential, recognizing the wide latitude that negotiators need for the effective performance of their bargaining responsibilities."  <u>Id.</u> at 78.  That standard "gives the union room to make discretionary decisions and choices, even if those judgments are ultimately wrong," and even if its errors in judgment may rise to the level of negligence. <u>Marquez v. Screen Actors Guild, Inc.</u>, 525 U.S. 33, 45–46 (1998); <u>see also</u> <u>United Steelworkers of Am. v. Rawson</u>, 495 U.S. 362, 372–73 (1990) ( "[M]ere negligence, even in the enforcement of a collective-bargaining agreement, would not state a claim for breach of the duty of fair representation.").  Furthermore, when reviewing representation at a grievance hearing, courts must give "due regard for the fact that both the advocates and the tribunal members are laymen," not lawyers.  <u>Findley v. Jones Motor Freight, Div. Allegheny Cnty.</u>, 639 F.2d 953, 961 (3d Cir. 1981); <u>see also</u> <u>Deans v. Kennedy House, Inc.</u>, 998 F. Supp. 2d 393, 419 (E.D. Pa. 2014).  Thus, even if a plaintiff's allegations that the Union attorney failed to develop certain arguments are well-founded, they constitute mere disagreements over tactics and strategy, not a breach of the duty of fair representation.  <u>DeFillippes v. Star Ledger</u>, 872 F. Supp. 138, 141 (D.N.J. 1994).

Nevertheless, it remains well established that a union must "serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct."  <u>Marquez</u>, 525 U.S. at 44 (quotations omitted).  To fulfill the duty of fair representation a union's representation "must be vigorous

enough so that available opportunities to present [a] grievance are utilized, and sufficiently thorough so that the basic issues are presented in an understandable fashion." Findley, 639 F.2d at 961. A union "may not arbitrarily ignore a meritorious grievance or process it in a perfunctory fashion." Vaca, 386 U.S. at 191.

While Plaintiff's Amended Complaint still borders on speculation, the Court finds that Plaintiff has set forth sufficient allegations from which to draw a plausible inference that the Union breached its duty of fair representation. Specifically, Plaintiff alleges that:

- For Plaintiff's Step Three Grievance Hearing to preserve his employment in April 2013, he was supposed to have been represented by the Union's best trial attorney, James Runkel, but at the last minute, Plaintiff was informed that he would be represented by a newly-hired lawyer. (Am. Compl. ¶ 68.)

- The new lawyer refused to advance the argument that ABM's policy dictated that it could not fire Plaintiff for a first-time offense of falling asleep. (Id. ¶ 69.)

- The Union and its new attorney failed to prepare Plaintiff for his hearing. (Id. ¶ 70.)

- The Union refused to use informal means, such as publicity and rallying, to preserve Plaintiff's job, despite the fact that it did so for other Caucasian employees. (Id. ¶¶ 70–71.)

Such allegations suggest that when Plaintiff faced what he believed to be an improper termination by his employer, the Union did not defend him at the outset using informal means. Rather, it waited until he got to the Step Three Grievance Hearing phase to get involved. Thereafter, the Union promised Plaintiff the services of their best attorney, James Runkel. At the last minute, however, the Union withdrew Mr. Runkel, put in new counsel, and subsequently failed to either advance a meritorious argument or prepare Plaintiff for any strategy. Read in the light most favorable to Plaintiff, the Amended Complaint plausibly alleges—albeit barely—conduct beyond "mere ineptitude" or "negligence" that rises to the level of actual bad

faith or arbitrary conduct. At this early stage, a reasonable factfinder could determine that the

Union's representation of Plaintiff was not "vigorous enough so that available opportunities to

present [a] grievance [were] utilized" or "sufficiently thorough so that the basic issues are

presented in an understandable fashion."[3] Findley, 639 F.2d 961.

### b.     Racial Motivation

To show a breach of the duty of fair representation for purposes of the second element, an

employee must show more than that the union refused to represent the employee, "even if the

---

[3] The Union argues that employees are not entitled to any legal representation, let alone their choice of attorneys, during the grievance process. See Johnson v. United Steelworkers of Am., Dist. 7, Local Union No. 2378-B, 843 F. Supp. 944, 947 (M.D. Pa. 1994) ("[N]o court has adopted the rule that employees are entitled to independently retained counsel in arbitration proceedings, or that the exclusion of such attorneys from arbitration violates the duty of fair representation. . . . Federal law provides that unions are to be the exclusive bargaining representatives for workers in union shops and, as such, disfavors attorney involvement in grievance resolution.") (internal quotations omitted).

Had Plaintiff simply alleged that he was not provided with his choice of attorney, as he did in his original Complaint, the Union's argument would be persuasive. Similarly, had the Union never offered attorney representation to Plaintiff, but opted to pursue the matter through use of union stewards, the Court could not find a breach of duty. The Amended Complaint, however, suggests that Plaintiff was originally given the representation of an experienced attorney, but, at the last minute and with no explanation, that attorney pulled out of the case and an inexperienced and ill-prepared attorney replaced him. Thereafter, Plaintiff attended his hearing with an attorney who had never prepared him with the defense strategy. Assuming such allegations to be true, the Court must find that Plaintiff has stated a breach of the duty of fair representation.

As a final point, the Court finds no merit to the Union's tangential argument that the Amended Complaint contains a "bizarre and unexplained contradiction" by alleging that Mr. Runkel was racist and then simultaneously complaining that the Union discriminated against him by failing to provide him with the services of a Union's racist attorney. (Union's Mem. Supp. Mot. Dismiss 11 n.3.) Assuming that Plaintiff's allegations about Mr. Runkel's personal biases are true, the Court would hope that, consistent with his obligations as a member of the bar, Mr. Runkel would still provide his exceptional legal services to all individuals he represents. Accordingly, it is not contradictory for Plaintiff to have desired that Mr. Runkel provide his services, especially when he was the attorney who had allegedly been preparing for Plaintiff's Step Three Grievance hearing up until the last minute.

[employee's] claim was meritorious." Findley, 639 F.2d at 958. Rather, "[p]roof of arbitrary or bad faith union conduct in deciding not to proceed with the grievance is necessary to establish lack of . . . fair representation." Id. "To demonstrate bad faith, the plaintiff must show that the union had hostility toward plaintiff or the plaintiff's class and that the hostility negatively affected the union's representation of the plaintiff." Boyer v. Johnson Matthey, Inc., No. Civ.A.02-8382, 2005 WL 35893, at *9 (E.D. Pa. Jan. 6, 2005) (citing Bell v. Glass, Molders, Pottery, Plastics & Allied Workers Int'l Union, No. Civ.A.00–1693, 2002 WL 3210721, at *4 (W.D. Pa. Aug. 29, 2002). A plaintiff may establish an inference of discrimination in many ways but must produce "evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion." Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 355 (3d Cir. 1999) (quoting O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 312 (1996)). Some methods of producing an inference of discrimination include, but are not limited to "comparator evidence, evidence of similar racial discrimination of other employees, or direct evidence of discrimination from statements or actions by her supervisors suggesting racial animus." Golod v. Bank of Am. Corp., 403 F. App'x 699, 703 (3d Cir. 2010) (citing Swierkiewicz v. Sorema N.A., 534 U.S. 506, 511–12 (2002)). "The 'central focus' of the prima facie case is 'always whether the employer is treating some people less favorably than others because of their race . . . .'" Sarullo v. U.S. Postal Serv., 352 F.3d 789, 798 (3d Cir. 2003) (quoting Pivirotto, 191 F.3d at 352) (internal quotation marks omitted). This requires that a plaintiff present sufficient evidence to allow a fact finder to conclude that the union is "treating some people less favorably than others based upon a trait that is protected under Title VII." Iadimarco v. Runyon, 190 F.3d 151, 161 (3d Cir. 1999).

In the present case, Plaintiff alleges—as he did in his original Complaint—that the Union discriminated against him by providing him with inferior representation in comparison with similarly-situated Caucasian Union members, had a pattern and practice of providing more aggressive representation to protect the rights of Caucasian Union members than those of African-Americans Union members, and intentionally treating Plaintiff in a discriminatory manner based on race in comparison with similarly-situated Caucasian Union members. Unlike the previous Complaint, however, Plaintiff's Amended Complaint offers some factual allegations on which the Court can infer racial hostility. For example:

- Plaintiff asserts that the Union repeatedly fired competent African American staffers, including Ms. Spencer, Jackie, Leo, and Karen, and replaced them with Caucasian staffers. (Am. Compl. ¶¶ 60–61.)

- When Caucasian janitor Bianca Mandia was fired from the building in which she was assigned to clean, the Union created a flyer on her behalf and held three rallies to preserve her employment. (Id. ¶¶ 46, 71.)

- Caucasian janitor Adam was accused of indecently exposing himself to people in the men's bathroom, yet the Union "worked hard" with ABM to prevent his termination before the Third Step Hearing. (Id. ¶¶ 47, 72.)

- Caucasian janitor Zemma was alleged to have defecated on the floor, but the Union also "worked hard" to prevent her termination. (Id. ¶¶ 48, 72.)

- African American Union member Gimeling, also a janitor, had ongoing issues with her employer and the Union would not give her legal counsel, ultimately resulting in her termination. (Id. ¶ 73.)

The Union now responds that these individuals do not provide meaningful comparators with Plaintiff for purposes of stating a claim of discrimination under either Title VII or Section 1981. As noted previously by this Court, to be "similarly situated" for the purposes of a workplace discrimination or retaliation case, "comparator employees 'must be similarly situated

in all relevant respects.'" Philpot v. Amtrak, No. Civ.A.10-1276, 2011 WL 5339030, at *5 (E.D. Pa. Nov. 3, 2011) (citing Wilcher v. Postmaster Gen., 441 F. App'x 879, 882 (3d Cir. 2011)) (further citations omitted). As the Third Circuit has explained, "[a] determination of whether employees are similarly situated takes into account factors such as the employee's job responsibilities, the supervisors and decision-makers, and the nature of the misconduct engaged in." Wilcher, 441 F. App'x at 882. The Union contends that since none of the comparator individuals were actually discharged by ABM, "[t]he Union's advocacy on behalf of these members would never be comparable to its advocacy on behalf of [Plaintiff]." (Union Mem. Supp. Mot. Dismiss 14.) In addition, it asserts that—assuming that the Union's actions on behalf of these three Caucasian employees somehow prevented ABM from discharging them—the Amended Complaint makes no mention of these employees disciplinary histories.

Such arguments, while perhaps appropriate at the summary judgment stage, must fail for purposes of the present Motion. "At the motion to dismiss stage, [the plaintiff] must allege facts sufficient to make plausible the existence of . . . similarly situated parties." Perano v. Twp. of Tilden, 423 F. App'x 234, 238 (3d Cir. 2011). To be similarly situated, the other employee must hold the same position as the plaintiff and be subject to the same circumstances. Lee v. Valley Forge Military Academy, No. Civ.A.08-527, 2008 WL 4899465, at *5 (E.D. Pa. Nov. 14, 2008). "Determining whether another employee is similarly situated is a fact-specific inquiry but one still amenable to resolution at the summary judgment stage." Id.. "For that reason, some courts in this Circuit have stated that 'a final determination of this issue is inappropriate at the motion-to-dismiss stage.'" Thomas v. Coopersmith, No. Civ.A.11-7575, 2012 WL 3599415, at *5 (E.D. Pa. Aug. 21, 2012) (quoting Chan v. Cnty. of Lancaster, No. Civ.A.10-3424, 2011 WL

4478283, at *15 (E.D. Pa. Sept. 2, 2011)). Under this law, at this stage of the litigation, and accepting Plaintiff's facts as true, Plaintiff's allegations that the Union gave differential treatment to Union members employed by ABM, who were outside of Plaintiff's protected class, are sufficient.

Beyond simply providing allegations regarding the Union's differential treatment of similarly-situated individuals, Plaintiff's Amended Complaint—unlike his original Complaint—offers allegations of remarks and comments evidencing that the Union was perhaps motivated by racial animus. It is well established that "[s]tray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if there were made temporally remote from the date of decision." Ezold v. Wolf, Block, Schorr & Solis-Cohen 983 F.2d 509, 545 (3d Cir. 1992). Nonetheless, "[d]iscriminatory comments made in the workplace are relevant circumstantial evidence probative of a decision maker's motivations in making employment decisions." Davis v. Gen. Accident Ins. Co. of Am., No. Civ.A.98-4736, 2000 WL 1780235, at *7 (E.D. Pa. Dec. 4, 2000). When determining whether such remarks allow an inference of discrimination, the Court must consider three factors: (1) relationship of the speaker to the employee within the corporate hierarchy; (2) the purpose and content of the statement; and (3) the temporal proximity of the statement to the adverse employment decision. Parker v. Verizon Pa., Inc., 309 F. App'x 551, 559 (3d Cir. 2009).

In the Amended Complaint, Plaintiff suggests that, based on personal observations of other African-American Union members, it was "common knowledge that both Mr. MacManiman and Mr. Smith used ongoing racial slurs and racial jokes and/or racial remarks, during the relevant time period for this Amended Complaint." (Am. Compl. ¶ 58.) In some of

these remarks, Mssrs. MacManiman and Smith referred to African-Americans as "monkeys and/or flying monkeys." (Id.) Plaintiff identifies two Union members—Ms. Spencer and Gimeling—who observed MacManiman and Smith general using offensive racial epithets, and noted that these two men generally granted less access to the Union to African-Americans in favor of Caucasians. (Id.) Ms. Spencer also observed that MacManiman and Smith appeared to have an orchestrated plan to remove African American Union staffers and to back management against African American Union members. (Id. ¶¶ 64–67.) Given MacManiman's and Smith's status as Union leaders, the fact that the statements were generally made about African-American Union members, and the alleged temporal proximity of these remarks to the incidents in question, the Court must find—taking such allegations as true—that Plaintiff has properly pled an inference of discrimination.[4]

Taken in conjunction, the individual allegations of both disparate treatment and racial

---

[4] The Union argues that many of Plaintiff's allegations rely on the claimed observations of former Union staff or former Union members, none of whom are parties to the action, and that Plaintiff alleges no direct personal knowledge of any of the allegations. Moreover, the Union contends that nearly all of the allegations are "mere conclusory statements and all of them are entirely devoid of specific dates, times, names and factual circumstances which could bear any relevance on the Union's treatment of Plaintiff concerning his claims in this action." (Union's Mem. Supp. Mot. Dismiss 5.)

The Union's argument asks too much of Plaintiff at this early stage of the litigation. Unlike a complaint alleging fraud, a complaint alleging discrimination need not be pled with the specificity the Union seems to demand, such as time, place, and additional factual circumstances. Moreover, the mere fact that allegations are made "on information and belief" or without personal knowledge of the Plaintiff does not render the Amended Complaint invalid. Even under a heightened pleading standard—which does not apply here—allegations may be made upon information and belief so long as the plaintiff identifies the sources upon which such beliefs are based. In re Aetna Secs. Litig., 34 F. Supp. 2d 935, 942 (E.D. Pa. 1999). Plaintiff, in this case, clearly does so. To the extent the Union needs to discern additional factual circumstances that could bear relevance on its treatment of Plaintiff, such matters are more appropriate for discovery.

comments allow a finding that the Union purposefully breached its duty of fair representation to Plaintiff based on racial considerations. Even with the additional allegations, however, Plaintiff's claim of racial discrimination stands on particularly tenuous grounds. Nonetheless, should the various witnesses identified by Plaintiff be able to substantiate the allegations made in the Amended Complaint—an assumption the Court is bound to make on Federal Rule of Civil Procedure 12(b)(6) review—Plaintiff could plausibly plead a Title VII claim against the Union. Accordingly, the Motion to Dismiss this claim must be denied.[5]

### B.   Section 1981 Claim

The Union also seeks dismissal of Plaintiff's claim pursuant to 42 U.S.C. § 1981. As this Court noted in the prior Memorandum Opinion, a claim under § 1981 generally requires the same elements of proof as an employment discrimination claim under Title VII, but "is limited to issues of racial discrimination in the making and enforcing of contracts." Anjelino v. N.Y.

---

[5]  The Union seeks to dismiss Plaintiff's allegations that it engaged in unlawful discrimination when it was slow to investigate Plaintiff's complaint about his work assignments or when it failed to assist Plaintiff's request that ABM transfer him to another job site. In support of the requested relief, the Union argues: (1) Plaintiff does not allege that he exhausted his administrative remedies concerning these alleged acts of discrimination by having filed a charge of discrimination with the EEOC; and (2) Plaintiff cites no comparators where the Union mobilized into action on behalf of other races over their complaints about being assigned too much work or wanting a transfer to another job site to avoid a dislike supervisor.

As to the first argument, the Union does not attach the EEOC complaint or even cite to its contents, but rather invites the Court to refer back to the Union's Motion to Dismiss the original Complaint. Given the Union's otherwise cursory argument on this point, the Court declines to scour the record to adduce appropriate support for this assertion. As to the second argument regarding comparators, the Court finds that Plaintiff has, at least for purposes of the Motion to Dismiss, made sufficient allegations about comparators with respect to the other forms of breach of the duty of fair representation by the Union. As discovery on those issues will proceed, Plaintiff may be able to adduce evidence that the Union's other failures to assist Plaintiff are simply part of a continuing pattern. In any event, the Court will not dismiss such claims now, but will instead reassess their merits following discovery.

Times Co., 200 F.3d 73, 98 (3d Cir. 1999); see also Brown v. Philip Morris Inc., 250 F.3d 789, 797 (3d Cir. 2001) (requiring § 1981 claimants to establish "intent to discriminate on the basis of race").  A union may be liable under § 1981 if it instigated or actively supported an employer's discriminatory actions or if it otherwise discriminated against one of its members.  Deans v. Kennedy House, Inc., 998 F. Supp. 2d 393, 14 (E.D. Pa. 2014).  "A union's failure 'to challenge discriminatory discharges' or its 'refusal to assert racial discrimination as a ground for grievances' can constitute such unlawful discrimination."  Id. (quotations omitted).

The Court previously remarked that "[s]imply stating that one endured race discrimination without presenting allegations suggestive of such conduct does not meet [Third Circuit] pleading standards."  Funayama v. Nichia Am. Corp., No. Civ.A.08–5599, 2009 WL 1437656 at *5 (E.D. Pa. May 21, 2009).  Repeatedly, courts have dismissed claims under § 1981 where the plaintiffs offered only generalized legal conclusions regarding the unions' alleged racial animus.  See, e.g., Deserne v. Madlyn and Leonard Abramson Ctr. For Jewish Life, Inc., No. Civ.A.10-3699, 2011 WL 605699, at *2 (E.D. Pa. Feb. 16, 2011) (holding that allegations that plaintiff and other unidentified black Haitian colleagues were denied performance evaluations and salary increases while unidentified Caucasian colleagues received performance evaluations and salary increases was insufficient to plead a § 1981 claim where plaintiff did not identify the race of the individuals who determined whether or not to grant performance evaluations or salary increases); Kiniropoulos v. Northampton Cnty. Child Welfare Serv., 917 F. Supp. 2d 377, 389 (E.D. Pa. 2013) (dismissing discrimination claim were the plaintiff merely alleged that he was born in Greece, he was qualified for the position he held with the defendant, he was discriminated against on the basis of national origin, and the defendants blatantly treated

employees born in the United States more favorably; the complaint did not state any facts other than those conclusory allegations and failed to set forth that the other employees were similarly situated or that they were in fact treated differently under similar circumstances); <u>Anh Truong v. Dart Container Corp.</u>, No. Civ.A.09-3398, 2010 WL 4237944, at *3 (E.D. Pa. Oct. 26, 2010) (granting Rule 12(b)(6) dismissal where plaintiffs' bald assertions that "Defendant Dart Container discriminated against the plaintiffs and treated them differently, disparately, wrongfully suspended, and wrongfully discharged them because of their common native language, Vietnamese, their Asian race, color, ethnicity and Vietnamese nationality. Defendant has a pattern and practice of disparate treatment and discrimination against nonwhite employees (because of their race, color, ethnicity, and/or nationality)" were nothing more than conclusory statements devoid of any actual underlying facts suggesting that their terminations had anything to do with race or national origin).

In his original Complaint, Plaintiff offered nothing more than his general opinion that the Union has more vigorously protected the rights of Caucasians over those of African Americans, without setting forth any facts upon which his opinion was based. Following the case law set forth above, the Court therefore dismissed this claim. In the Amended Complaint, however, Plaintiff has sufficiently pled specific facts regarding Caucasian, Union-member janitors, who were consistently given more vigorous advocacy than African American Union members. He has also asserted that the Union leaders/decisionmakers made racially discriminatory remarks and had a general pattern of undermining the defense of African American Union members so as to ensure their dismissal. Granting all reasonable inferences in favor of Plaintiff, the Court also declines to dismiss this claim.

**IV.     CONCLUSION**

Having been given a second bite at the pleading apple, Plaintiff has managed to sufficiently set forth claims against the Union under both Title VII and § 1981.  By asserting that the Union effectively pulled a "bait and switch" with Plaintiff regarding his representation at the Step Three Grievance, resulting in a key argument not being presented, Plaintiff has pled arbitrary denial of the Union's obligations toward him.  Moreover, by setting forth (a) examples of Caucasian employees who were given better representation in seemingly similar circumstances and (b) allegations of racial epithets by Union leaders regarding Union members around the same time of the events in this action, Plaintiff has made a plausible claim of racial animus.  As noted above, however, Plaintiff's claims against the Union stand on tenuous grounds and Plaintiff will have to provide sufficiently more proof to withstand summary judgment.  For purposes of the present Motion, though, Plaintiff's allegations, taken as true, suffice to state an appropriate claim for relief.  As such, the Union's Motion to Dismiss is denied in its entirety.

An appropriate Order follows.